# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,
v.
ROBERT BOYD RHOADES,
Defendant and Appellant.

S082101

Sacramento County Superior Court
98F00230

_____

November 25, 2019

Justice Kruger authored the opinion of the Court, in which Chief Justice Cantil-Sakauye, Justices Chin, Corrigan, Cuéllar, and Groban concurred.

Justice Liu filed a dissenting opinion.

_____

1

PEOPLE v. RHOADES
S082101

Opinion of the Court by Kruger, J.

Defendant Robert Boyd Rhoades was convicted of the first degree murder of Michael Lyons, with special circumstances of murder in the commission of forcible sodomy, murder in the commission of a lewd act on a child, and murder by torture. He was sentenced to death for the crime. In this automatic appeal (Cal. Const., art. VI, § 11, subd. (a); Pen. Code, § 1239, subd. (b)), we now affirm the judgment.

## BACKGROUND

On May 16, 1996, eight-year-old Michael Lyons went missing after attending school in Yuba City. His body was found the next day on the banks of the Feather River. He had been stabbed to death sometime between the late afternoon of May 16 and the early morning of May 17. Defendant was tied to the crime mainly by physical evidence indicating that Michael was attacked in defendant's pickup truck, which was found stuck in the muddy river banks on May 17, and that the murder weapon was a fishing knife defendant kept in the back of his truck.

Defendant was charged in Sutter County with first degree murder (count 1; Pen. Code, § 187) with special circumstances of murder in the commission of kidnapping, murder in the commission of sodomy, murder in the commission of a lewd act on a child, and intentional murder involving the infliction of

1

torture (*id.*, § 190.2, subd. (a)(17)(B), (a)(17)(D), (a)(17)(E), (a)(18)); kidnapping (count 2; *id.*, § 207, subd. (a)); kidnapping for the purpose of committing a lewd act with a child (count 3; *id.*, § 207, subd. (b)); torture (count 4; *id.*, § 206); sodomy by force or with a person under 14 years of age and more than 10 years younger than the perpetrator (count 5; *id.*, § 286, subd. (c)); a lewd or lascivious act on a child under the age of 14 (count 6; *id.*, § 288, subd. (a)); a lewd or lascivious act on a child under the age of 14 by force or duress (count 7; *id.*, § 288, subd. (b)(1)); oral copulation by force or with a person under 14 years of age and more than 10 years younger than the perpetrator (count 8; *id.*, former § 288a, subd. (c)[1]); and possession of methamphetamine (count 9; Health & Saf. Code, § 11377, subd. (a)). The information also alleged prior convictions and prison terms for purposes of sentence enhancements and sentencing under the "Three Strikes" law (Pen. Code, §§ 667, 667.5, 1170.12) and a misdemeanor charge of possessing a hypodermic needle or syringe (count 10; Bus. & Prof. Code, former § 4140, added by Stats. 1996, ch. 890, § 3 and repealed by Stats. 2011, ch. 738, § 2, eff. Jan. 1, 2012).

After the Sutter County court granted a motion for change of venue, the case was tried in Sacramento County. The guilt trial began on April 14, 1998, and concluded with jury verdicts on June 17, 1998. The jury convicted on all counts except those charging kidnapping (counts 2 and 3) and forcible oral copulation (count 8), as to which it could not reach a verdict, and found true the special circumstances, except that for murder in

---

[1] Former section 288a of the Penal Code was recently renumbered as section 287. (Stats. 2018, ch. 423, § 49, pp. 3218–3221.)

the commission of kidnapping, as to which it could not reach a verdict. A mistrial was declared on the counts and allegation as to which the jury was deadlocked, and those counts were dismissed on the prosecutor's motion.

The first penalty trial ended in a mistrial on July 9, 1998, when the jury was unable to reach a verdict. The penalty retrial began on December 1, 1998, with selection of a new penalty jury and concluded with a verdict of death on March 19, 1999. On September 10, 1999, the Sacramento County Superior Court sentenced defendant to death for first degree murder with special circumstances, to life terms (stayed under Pen. Code, § 654) for sodomy, lewd act with a child, and torture, and to a determinate term for his prior convictions and prison terms. Defendant's automatic appeal was noticed the same day.

### Guilt Phase Evidence

Michael Lyons lived in Yuba City with his mother, stepfather, and two younger sisters. He attended third grade at a school in their neighborhood. Various witnesses saw him leave school on the afternoon of May 16, 1996. Michael's teacher testified that Michael left the classroom when his last class ended at 2:50 p.m. Another teacher, who was on gate duty that day, testified that Michael left the school at 3:05 p.m. The teacher noted the time because Michael was the last student to leave, and she was anxious to get inside out of the rain. Sometime after 3:00 p.m., a neighbor of Michael's saw him walking by himself, carrying a stick, along C Street in Yuba City.

Two witnesses testified to a possible child abduction on the afternoon of May 16. Raymie Clark was standing on an apartment balcony overlooking C and Boyd Streets. From a

distance of about 400 yards, Clark saw a boy walking and playing with a stick. A pickup truck with a camper shell stopped and the boy ran up to the truck, then backed up and started pointing, then went back toward the truck. When the truck pulled away, the boy was no longer there, and as the truck drove away, the passenger door opened and then "slammed shut." Charlie Wilbur, who was Clark's cousin, came out to the balcony as the truck drove away and Clark drew his attention to it. Wilbur described the truck as a creamy white, while Clark saw it as a shiny gold color. (Although it was raining at the time, the sun was also shining brightly.) Clark's and Wilbur's time estimates for this occurrence varied between 2:45 p.m. and 3:30 or 4:00 p.m.

After school, Michael sometimes went to stay with his grandmother, who lived close to the school; otherwise, he was supposed to walk home. On May 16, Michael's grandmother was working late and never saw Michael, and he never arrived at home. A police-organized search for Michael began on the night of May 16, around 8:00 p.m., was suspended later that night, and resumed on the morning of May 17.

At around 11:00 a.m. on May 17, a search team found Michael's body in the "river bottoms" along the banks of the Feather River. The body was lying under some bushes in a wet, muddy area near the river. He was found naked from the waist down and with a dark green sweater pulled up over his head.

Between Michael's body and the river, which was 10 to 15 feet away, was a bloodstained blanket. Defendant's wife later told police the blanket appeared to be one defendant kept in his pickup truck. Under the body, police found a silver bracelet. Both defendant's wife and the owner of the bracelet later

4

identified the bracelet as having recently been in defendant's truck. About 12 to 15 feet from the body, in the dirt and sand by the river, were footprints, of which castings were made. The impressions were later found to match defendant's feet in overall size, shape and toe form.

Dr. James Dibdin performed Michael's autopsy. Michael had suffered a pair of deep cuts with a knife to the left side of his neck, one superimposed on the other, which would in themselves have been fatal. In addition, he had been cut across the right side of his neck and stabbed on the left side of his chest, puncturing his lung, and on the left abdomen through to his back (the latter two both deadly wounds). He also suffered defensive wounds to his hands. Dr. Dibdin found multiple lacerations to Michael's anus, one an inch long, internal bleeding associated with these lacerations, and abrasions and bruising on the buttocks. Dr. Dibdin opined that the cause of all these injuries was forcible sodomization with a penis. Rectal swabs and smears showed the presence of semen. Michael's lips were also bruised on the inside, having been forced against his teeth. The cause could have been a penis being pushed into his mouth, a hand placed hard over his mouth, or both. Finally, Dr. Dibdin described a group of shallow stab wounds below Michael's chin, caused by repeatedly jabbing with the tip of a knife, a set of straight line abrasions on Michael's face and buttocks, suggesting a serrated knife being scraped across the skin, and four stab wounds to Michael's buttocks and hip, one three and one-half inches deep.

The cause of death was multiple stab and incised wounds with contributing factors of anal penetration and repetitive minor injuries. From the degree of rigor mortis, Dr. Dibdin

estimated Michael died 12 to 24 hours before the autopsy, or between 4:00 p.m. on May 16 and 4:00 a.m. on May 17.

On the morning of May 17, 1996, a party of volunteers searching the river bottoms for Michael had encountered defendant, who was wearing pants and no shirt and seemed nervous or shocked. Defendant asked for help getting his truck out, saying he was in a hurry to leave town. The volunteers continued their search.

Later that morning, a Sutter County Sheriff's Department patrol boat went to the site where Michael's body had been found, and from there proceeded south downstream looking for evidence or for other people in the area. Between a quarter-mile and a half-mile from where the body was found, the sheriff's patrol came upon defendant's truck, a white or beige pickup with a camper shell, stuck in the mud right at the river's edge. Despite the loud noise of the boat's exhaust system and its official markings, defendant, who was sitting motionless in the driver's seat, did not react to its presence until the boat came closer. Defendant made eye contact with the patrol sergeant, at which point he got out of the truck and stood on the bank. Defendant was wearing only a pair of wet blue jeans; despite the cold, breezy and intermittently wet weather he was shirtless, barefoot, and (it was later discovered) wore no underwear. According to the sheriff's sergeant, defendant also appeared unenthusiastic about encountering the sheriff's boat, even though his situation appeared somewhat perilous.

Defendant was brought aboard the boat and handcuffed. As officers took defendant north to the Yuba City boat ramp, they passed the scene of the body's discovery, where several

6

people in white coveralls were now working.  Defendant stared straight ahead and did not look at the scene.

Defendant's truck was at the river's edge, partly in the water.  The cable of a small come-along winch was wrapped at one end around the rear axle and at the other around a tree.  On the open tailgate, there was a fishing knife, a thin bladed fillet knife with a serrated edge.  The knife had blood underneath some sandy river soil in corners where the blade met the handle; DNA testing showed the blood was Michael's.

Footprints matching Michael's were found on the inside of the truck's windshield.  Pubic hairs found on Michael's clothing (which could not have belonged to the eight-year-old victim) were consistent in color, shape, and structure with samples taken from defendant.  On brushing defendant's pubic area, a criminalist found silty river-bottom soil and a green polyester fiber.  The fiber matched a fiber from Michael's sweater in color, shape, diameter, fiber type, and internal structure.  There was blood on Michael's sweater and on defendant's jeans and underwear.  There was also a large bloodstain on defendant's shirt.  The blood on defendant's underwear and shirt, which were found in his truck, was dilute.  Examination of defendant's body after his arrest showed he had abrasions and scratches on his arm, hips, and inner thigh, and a possible bruise on his penis.  Methamphetamine and a syringe were found in defendant's truck; defendant's blood tested positive for methamphetamine.

The prosecution presented witnesses to show defendant's whereabouts on the afternoon of May 16, 1996.  Defendant's father, who ran a barbershop where defendant worked, testified defendant left the shop at around 11:00 a.m., saying he was

taking his truck to Sears for a repair. Defendant called at about 1:00 p.m. to say the repair was not finished yet but he would come in when it was.[2] The father did not hear from defendant again until defendant called from jail the next day. Employees and a fellow card player at Rooney's Card Room in Marysville testified that defendant played cards there from 1:00 p.m. until sometime after 3:00 p.m.; he tried to quit at 2:15 p.m., but because the house had staked him some money when he started playing, he had to play for at least two hours or share his winnings with the house. Defendant left Rooney's sometime between 3:00 p.m. and 3:30 p.m.; the other card player, who saw the clock when defendant left, remembered the time as 3:15 p.m. or 3:17 p.m. A police investigator timed the drive from Rooney's to the intersection of C and Boyd Streets in Yuba City (where Clark saw the possible child abduction) at under four minutes.

The prosecution introduced no statements by defendant to the police, but a Sutter County deputy sheriff testified to a statement defendant made during a recess in the preliminary hearing. After the time of death had been discussed in the proceedings, the deputy sheriff overheard defendant tell his attorney, "I can give them a better time of death than what they have."

The prosecution also presented two witnesses to describe defendant's behavior on a Yuba City public bus on May 14, 1996, two days before Michael's killing. Alicia Tapia testified she saw an unkempt, dirty man, whom she later identified as defendant, get on the bus wearing a long knife in a sheath. The man then

---

[2] The parties stipulated that the Sears Automotive shop in Yuba City had no record of providing services to defendant on May 16, 1996.

had a conversation with another man about child abuse and molestation. Tapia complained to the bus driver and the driver told defendant to change the subject and stop upsetting the passengers. Kevin Buchanan testified to a conversation he had on the bus that day with a man with a knife, whom he identified at trial as defendant. After they saw a woman on the street striking a child, the conversation turned to child abuse and child molestation. When Buchanan said he disliked molesters and would beat them up, defendant admitted he had been in prison for molesting a child and sometimes thought he would do it again. If he did, defendant said, he would kill the child. To Buchanan's further questions about how he would do it, defendant said he would take the child to the river bottoms and kill the child with his knife, which he displayed to Buchanan. A woman Buchanan described as a "Mexican lady" told them to change the subject because they were scaring her children.

Finally, the prosecution presented evidence of defendant's two prior sex offenses through the testimony of the victims. Sharon T. testified that in 1985, she became acquainted with defendant at the restaurant where she worked. After gaining entry to her apartment on a pretext, defendant put a large hunting knife to her throat, demanded money, handcuffed her, and forced her to orally copulate him. He then said he was taking her down to the river where he had to meet some people. As defendant drove her toward the river, he started laughing and said, "This is just like Bonnie and Clyde, but Bonnie's not going to make it." When they neared the levee, Sharon opened the passenger door and, after a struggle, jumped from the moving car. Defendant backed up toward her, but she rolled under the open door, then ran to a nearby public building.

Based on this incident, defendant was convicted of kidnapping, forcible oral copulation, and robbery.

The other victim, Crystal T., testified that in 1993, when she was four years old, defendant—who was married to Crystal's grandmother—touched her vagina and put his penis in her mouth. Defendant was convicted of a lewd act with a child.

Defendant testified in his own defense. He denied any contact with Michael Lyons. On May 16, 1996, he went to work at his father's barbershop but left before noon so that his father, who needed the money, could have more work. Instead of having his truck repaired as he had intended, he bought $60 worth of methamphetamine from a friend and, after injecting a small amount, went to Rooney's Card Room. He arrived at 1:00 p.m., played poker for two and a half hours and left around 3:30 p.m. He then drove to various places in Yuba City and Marysville looking for another friend who had told him she needed a ride, but did not find her. Defendant drove home to the town of Sutter and stayed there about an hour, then came back to Yuba City and down to the river bottoms, where he could use drugs without fear of encountering his family, the police, or his parole officer.

After defendant drove around the river bottoms, fished, and did some dope, defendant's truck got stuck sometime around 8:00 or 8:30 p.m. He tried unsuccessfully to free his truck for a couple of hours, but realized he needed his come-along winch, which was back at his house. During the night, he walked out of the river bottoms to his father's barbershop, stopped there to inject more methamphetamine, then walked and hitchhiked to his house in Sutter. After retrieving the come-along, he walked and hitchhiked back to Yuba City and returned to his truck in the river bottoms. He probably walked 10 miles during the

night.  Defendant testified that when the deputy sheriff overheard him talking about the time of Michael's death, he meant only that Michael must have been killed during this period when he was away from his truck.

Arriving back at his truck between 3:00 and 4:00 a.m. on May 17, defendant testified, he found it ransacked, with papers and tools strewn about.  Though he thought he had locked the cab when he left, the camper shell did not lock and he found the sliding windows between the cab and the camper open.  After freeing his truck with the come-along, defendant decided to head to the Shanghai Bend area of the river bottoms because he knew some people who stayed there.  On the way there, his truck again became stuck in the mud.  For the next eight hours, defendant tried but failed to free it.  He did not seek help from his father because his father would have been angry at him for using drugs; he had various reasons not to contact other relatives or acquaintances.  Though his truck was quite stuck, he believed he would eventually get it out by himself.

Defendant was not pleased to see the sheriff's patrol boat because he had drugs in his truck.  On the boat, defendant saw the people who looked like astronauts working on the shore but was not concerned by it.  He did not know why he was being arrested.

Defendant denied being on a bus on May 14 or behaving on the bus at any time as Tapia had described.  That day, he was occupied with returning a boat to his father and getting his wife's car repaired.

Defendant testified that the scratches on his body and the blood on his shirt were from dragging logs while trying to free his truck from the mud.  He did not know how much he was

bleeding or how his shirt got a large bloodstain running from one shoulder to the opposite armpit area.

In addition to presenting defendant's testimony, the defense presented evidence to discredit the testimony about the May 14 bus incident and to suggest that another person living in the river bottoms was involved in Michael's death. Defendant's father corroborated defendant's account of his activities on May 14, and the bus driver testified that had a passenger displayed a knife in a threatening manner she would have immediately reported the event to the police. The driver knew both Tapia and Buchanan and did not recall the events they described. Donald Dugger, who lived in a trailer in the river bottoms, testified that a couple of days after Michael's disappearance, Bobbie Lemmons—another bottoms resident, who had found Michael's shoes and pants while scavenging in the area—asked Dugger to provide him with an alibi for the night of May 16. Police found a pocket knife with "L" and "R" (defendant's wife's initials) engraved on its two sides in Lemmons's storage locker; he did not recall where he had gotten it. Defendant identified the knife as his wife's and a fishing pole found in the locker as one that had been in his truck. A man walking on the river bank around 4:15 p.m. on May 16 testified that he saw Michael (whom he did not know but later recognized from a photograph in the newspaper) playing there with another boy his age, and a woman who was fishing on the Marysville side of the river on May 16 (who also later recognized Michael from a photograph in the newspaper) testified she saw him with *two* men, one of whom she thought was defendant, on the Yuba City bank in the late afternoon.

### Penalty Retrial Evidence

On retrial of penalty after the first jury hung, the parties presented extensive evidence replicating that given at the guilt phase. In addition, Michael's aunt testified to the impact of Michael's death on her and on Michael's mother and sister. The prosecution also presented evidence that defendant had suffered convictions for check forgery in the 1980's, in addition to his convictions for the crimes against Sharon T. and Crystal T.

The defense presented three witnesses to support defendant's claim he had gone to a house looking for his friend on the afternoon of May 16, 1996. But of these witnesses, the only one who remembered seeing a man resembling defendant at the house was using drugs heavily at the time and had told the prosecution investigator she could not identify the man and did not really know what day he was there. The defense also presented evidence that Michael's stepfather had been convicted in 1995 of spousal abuse of Michael's mother and of evading a police officer, as well as the testimony of a forensic pathologist who disagreed with Dr. Dibdin's opinions in other cases but who had not reviewed any materials relating to Michael's death.

Defendant's father, mother, aunt, and sister testified about defendant's childhood and family life. Until defendant was about 10, his father gambled, drank, and cheated on defendant's mother, which caused a lot of turmoil in the family. After that, defendant's father returned to his religion, Seventh Day Adventism, and defendant was sent to a church school and was restricted in his activities. In his teens defendant fought with his father over the strict rules of their religion, over going to church, and over a boarding school he was sent to. Defendant's sister thought their father was overly strict and

critical with defendant. Defendant's family knew he had a drug problem, which began at the end of his high school years, but they loved him.

James Park, a consultant on adult prison operations and prisoner classification, reviewed the records of defendant's prior imprisonments, from 1986 to 1990 and 1993 to 1994. Although defendant had four disciplinary actions, there were also work reports indicating he was productive, did not cause trouble, and could help train other inmates and assist the employee-supervisor. Park opined that defendant would make a positive adjustment to state prison confinement.

## DISCUSSION

### Guilt Phase Issues

### I. In Camera Review of Medical and Psychological Records

The Federal Bureau of Investigation (FBI) conducted part of the investigation into Michael's death. Certain FBI interview reports produced before trial indicated that Michael had previously been molested by a relative. On several occasions both before and during trial, defendant subpoenaed and sought to compel production of various medical and psychological records concerning the prior molestation. On the basis of the FBI interview reports, defense counsel asserted the molestation may have continued to the time of Michael's death; counsel further argued that defendant had a due process right to the disclosure of the records because they might lead to development of exculpatory evidence. Seeking the records again before the second penalty trial, counsel also argued they were potentially relevant to impeach Dr. Dibdin, the autopsy

physician, and Tina Lyons, Michael's aunt, a penalty phase victim impact witness.

Before trial, the Sutter County Superior Court reviewed the records in camera, weighed their value to defendant's exercise of his constitutional rights against the various evidentiary privileges and privacy interests asserted, including the psychotherapist-patient privilege, and denied defendant's request to compel discovery of the records. Noting the documents were remote in time from Michael's murder, the court found nothing that would assist defendant in his presentation of a defense or confrontation of witnesses. The court denied the motion subject to renewal during trial if the material became relevant, however. During trial, the Sacramento County Superior Court also reviewed the materials and, on two occasions, again denied defense motions to compel their discovery on the ground that nothing in the records would assist the defense.

Defendant contends the trial court's refusal to order production of the medical and psychological records deprived him of his rights to due process, to confront witnesses, and to present a defense. Without access to the materials, defendant acknowledges he cannot argue their specific relevance, but he asserts they may have been relevant to show the existence of "other molestations and suspects" and to impeach "the rosy picture painted of Michael and his family in the victim impact portion of the penalty phase." He requests that this court review the materials, which are under seal, to determine if any of them should have been produced. The Attorney General does not oppose the request, and we agree that review of the sealed materials is appropriate to determine what relevance, if any,

they bear to the posited defenses or impeachment. (See *People v. Gurule* (2002) 28 Cal.4th 557, 592–595; *People v. Hammon* (1997) 15 Cal.4th 1117, 1122–1128; *People v. Webb* (1993) 6 Cal.4th 494, 517–518.)[3]

After our own review of the sealed records, we agree with the two superior courts that considered the issue: the records contain nothing of significance to the defense. As the lower courts observed, most of the materials relate to events remote in time from Michael's murder, and nothing in them casts suspicion for that crime on any person. Nor do the materials contradict Dr. Dibdin's testimony that he found no indications on Michael's anus or rectum of scarring from a previous molestation, or Tina Lyons's testimony that Michael's murder had taken away a part of Michael's mother, Sandra, and rendered her "lifeless," no longer carefree and happy as she had been before. We therefore find no error in denial of defendant's motions to compel discovery. (*People v. Webb*, *supra*, 6 Cal.4th at p. 518.)

## II. Admission of Hearsay Statements Made by Defendant's Wife

Defendant's wife, Lynnette Rhoades, invoked her marital privilege not to be called as a witness against her spouse. (Evid. Code, § 971.) Over defendant's hearsay objection, the court admitted the testimony of Yuba City Police Sergeant Michael Johnson that on May 20, 1996 (three days after defendant's arrest), Lynnette identified from photographs the blanket found near Michael's body and the bracelet found under the body.

---

[3] In the trial court, the parties disputed whether privileges had been validly asserted as to some of the records. Defendant does not renew those arguments on appeal.

According to Johnson, during an interview he conducted with her, Lynnette said the blanket appeared to be one defendant kept in the back of his pickup truck and that she had seen the bracelet in the truck a few days before Michael's murder.

On appeal, defendant contends admission of the hearsay statements violated his federal confrontation and due process rights. He argues that neither of the hearsay exceptions cited by the trial court as a basis for admission (namely, spontaneous statement (Evid. Code, § 1240) and statement against social interest (*id.*, § 1230)) applies. He also argues that admission of the statements violated his right of confrontation under the Sixth and Fourteenth Amendments to the United States Constitution. (See *Crawford v. Washington* (2004) 541 U.S. 36, 53–55, 68 (*Crawford*) [testimonial hearsay inadmissible under 6th Amend. unless declarant is unavailable and there has been a prior opportunity for cross-examination].)

The Attorney General defends the application of both hearsay exceptions but concedes that the statements—which were made in response to questioning by law enforcement officers seeking information to be used at a criminal trial—were testimonial and therefore barred under *Crawford*. The Attorney General maintains, however, that defendant forfeited his confrontation clause claim by failing to object on that ground at trial and that, in any event, admission of Lynnette's statements was harmless beyond a reasonable doubt.

We reject the Attorney General's forfeiture argument. Because defendant's trial preceded the decision in *Crawford*, his claim of a confrontation clause violation was preserved despite the absence of an objection on that ground. (*People v. Rangel* (2016) 62 Cal.4th 1192, 1215 [concluding that "in a case

tried before *Crawford*, a defendant does not forfeit a *Crawford* challenge by failing to raise a confrontation clause objection at trial"]; *People v. Chism* (2014) 58 Cal.4th 1266, 1288, fn. 8 ["[B]ecause defendant's counsel could not have anticipated *Crawford*'s sweeping changes to federal confrontation clause case law, he did not forfeit this claim by failing to object to the admission of [the] statements on federal constitutional grounds."].)

We further agree with both parties that Lynnette Rhoades's statements were testimonial and were inadmissible under *Crawford*. At an in limine hearing on their admissibility, Sergeant Johnson testified that he and an FBI agent interviewed Lynnette at her family home in Stockton on May 20, 1996. She told them she had just spoken to defendant's attorney and would not talk to them unless they could show her that defendant had committed a crime. They told her the victim's footprints had been found inside defendant's truck. She became extremely upset, crying, hyperventilating, and even vomiting. After about five minutes, she calmed down somewhat, though she was still crying, and agreed to talk with them. She then answered their questions in detail, including identifying the bracelet and blanket, and signed a written statement. Statements made to law enforcement officers in an interview primarily designed to obtain evidence of a past crime are considered testimonial. (*Davis v. Washington* (2006) 547 U.S. 813, 829–831; *Crawford, supra,* 541 U.S. at p. 53, fn. 4; *People v. Cage* (2007) 40 Cal.4th 965, 984.) As defendant had no opportunity to cross-examine the declarant, Lynnette's statements were inadmissible under the rule of *Crawford*.

We are, however, convinced beyond a reasonable doubt that this federal constitutional violation did not affect the jury's verdict. (*Chapman v. California* (1967) 386 U.S. 18, 24.) Because this harmlessness standard is more demanding than that applicable to errors under California evidence law (*People v. Watson* (1956) 46 Cal.2d 818, 836), we need not decide whether the trial court erred in finding either of the posited hearsay exceptions applicable. Other evidence more strongly tied the murder to defendant's truck, especially Michael's footprints on the inside of the windshield and his blood on defendant's knife, which police found on the truck tailgate. Moreover, the bracelet's owner identified it as one she had recently placed with other belongings in the truck. And defendant was linked to the murder by other physical evidence, including the blood on his clothing, the fiber found in his pubic area, and the pubic hairs on Michael's clothing and the footprints in the mud near Michael's body, both of which were consistent with defendant's.

Defendant argues the hearsay statements were particularly damaging in that they tended to show Lynnette had "turned on" defendant and believed him guilty, but in comparison to the physical evidence tying the murder to defendant such an implication bore little if any significance. Admission of Lynnette's statements, though error under the confrontation clause, was harmless beyond a reasonable doubt.

## III. Admission of Defendant's Remark Overheard by Deputy

As noted, Sheriff's Deputy Carlton Dinwiddie testified that during a recess in the preliminary hearing, he overheard defendant say to his attorney, "I can give them a better time of

death than what they have." Defendant renews his contention that the statement was within the attorney-client privilege and therefore should have been excluded under Evidence Code sections 952 and 954. He also argues the admission of the statement deprived him of his rights to counsel and to a fair trial. We find no error.

Deputy Dinwiddie testified at an in limine hearing to the circumstances in which he overheard the remark: Dinwiddie and another deputy were assigned to transport and guard defendant at the preliminary hearing. During a recess after testimony about the time of Michael's death, defendant, his attorney, and the defense investigator went into the jury room to confer. Each sheriff's deputy sat by one of the two open doors of the room; Dinwiddie was about 10 or 15 feet from defendant. At first, Dinwiddie could not hear what defendant or the others were saying, but at some point defendant stood up, raised his voice and said, "I can give them a better time of death than what they have." Defendant's attorney told him to be quiet, noting that the walls, or in this case the doors, have ears. The three men continued their conversation, but Dinwiddie could not hear what more they said.

Defendant's statement was not a confidential communication protected by the attorney-client privilege. (Evid. Code, § 954.) Only communications made "in confidence by a means which, so far as the client is aware, discloses the information to no third persons other than those who are present to further the interest of the client in the consultation or those to whom disclosure is reasonably necessary . . ." (*id.*, § 952) qualify as confidential. "Thus, where the client communicates with his attorney in the presence of other persons

who have no interest in the matter . . . he is held to have waived the privilege." (*D. I. Chadbourne, Inc. v. Superior Court* (1964) 60 Cal.2d 723, 735.) In circumstances similar to those here, California courts have applied these principles to hold that clients' oral communications to their lawyers during court proceedings or recesses were unprivileged because they were made so loudly as to be overheard by others who were openly and permissibly present. (*People v. Urbano* (2005) 128 Cal.App.4th 396, 402–403; *People v. Poulin* (1972) 27 Cal.App.3d 54, 64; *People v. Castiel* (1957) 153 Cal.App.2d 653, 659.)

While defendant may be correct that he had no choice of locations for consulting with his attorney, he did have a choice about how loudly to speak. He chose to do so in a manner that the deputy, who was openly and permissibly present, could overhear. The facts show there was no need for the defendant to make the reported remark so loudly: For most of the remainder of the conversation, the parties had spoken so quietly that Dinwiddie was unable to hear their words, and after defendant made the overheard remark his attorney told him to speak more quietly. (See *People v. Urbano, supra,* 128 Cal.App.4th at pp. 402–403 [trial court "found that Urbano had no need to speak in a voice 'loud enough for individuals in the audience to hear,' as his attorney was sitting right next to him in the jury box, but nevertheless made his communication in a way that 'clearly disclose[d] it to third persons' "].) And while defendant alludes to the deputies' "unnecessary proximity" and argues they were "essentially spying" on him, he refers to no evidence to support those characterizations. The deputies were 10 to 15 feet away by the open doors of the jury room; the record does not suggest they deliberately positioned themselves so as to overhear defendant or his attorney.

The trial court properly overruled defendant's attorney-client privilege objection. Although on appeal defendant claims admission of the statement violated his federal constitutional rights, he makes no argument for such violation other than that the communication was privileged. Defendant's constitutional claim therefore fails along with the Evidence Code claim.

## IV. Admission of Evidence of Defendant's Prior Offenses

Through in limine motions, defendant contested the admissibility of defendant's prior crimes against Sharon T., the acquaintance whom defendant sexually assaulted in her home, robbed, and drove toward the river bottoms, and Crystal T., the four-year-old relative whom defendant molested. The trial court ruled evidence of both crimes admissible under Evidence Code sections 1101, subdivision (b), and 1108, and declined to exclude the evidence under Evidence Code section 352, though the court excluded evidence of a third prior incident as more prejudicial than probative. On appeal, defendant contends the court abused its discretion under Evidence Code section 352 in admitting the Sharon T. and Crystal T. evidence. He also argues that the admission of the evidence violated his federal constitutional rights to due process and a fair jury trial. We find no statutory or constitutional error.

The facts of the Sharon T. and Crystal T. incidents, as outlined in the People's motion papers arguing for their admissibility, were as follows: In 1985, defendant telephoned Sharon and said he wanted to discuss a piece of real estate with her. He came to her Marysville apartment and she let him in. After they talked for a while in her living room, he moved to sit beside her, pulled out a six- or seven-inch knife and put it to her

neck, pulling back her head by her hair. Defendant told Sharon he was wanted for armed robbery and needed to stay with her for 24 hours, then demanded money, taking $50 in cash and her ATM card.

Defendant handcuffed Sharon, ordered her into the bedroom, took off her clothes, and forced her to orally copulate him until he ejaculated. Then, after loosening one of the handcuffs, he told her to get dressed, saying they were going for a ride to Riverfront Park. He wiped down surfaces in the apartment, remarking that "people who make mistakes get caught." Taking her car keys, he told Sharon he had a gun and would kill her if she tried to run. During the ride down to the river, he compared the two of them to Bonnie and Clyde, but noted that Bonnie "isn't going to make it." Sharon, believing defendant would kill her if they got to the river, jumped from the moving car. After evading defendant's attempt to recapture her, she ran to a nearby building for help.

In 1993, defendant molested Crystal T., the granddaughter of his wife, Lynnette. Crystal and her mother (Lynnette's daughter) lived in the same trailer park as defendant and Lynnette. After Crystal's mother left her with a babysitter in the trailer park, defendant telephoned the sitter and told her to send Crystal to his trailer. When the mother came home, Crystal was still in defendant's trailer. That evening, Crystal said that "Grandpa made me put his pee in my mouth and it was yucky." The same evening, she repeated the report to a police detective, adding that defendant "rubbed his pee on my pee and butt."

The trial court properly admitted defendant's sexual offenses against Sharon and Crystal under Evidence Code

section 1108, subdivision (a). That provision states: "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352." (*Id.*, § 1108, subd. (a).) The first of the two referenced provisions, Evidence Code section 1101, sets out a general rule against using propensity evidence to prove a person's conduct on a particular occasion. (*Id.*, § 1101, subd. (a).) The second, Evidence Code section 352, sets out the general rule that "[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." As we have explained, Evidence Code section 1108 by its terms establishes an exception to the general rule against admitting propensity evidence, " 'provid[ing] the trier of fact in a sex offense case the opportunity to learn of the defendant's possible disposition to commit sex crimes.' " (*People v. Jones* (2012) 54 Cal.4th 1, 49 (*Jones*), quoting *People v. Falsetta* (1999) 21 Cal.4th 903, 915 (*Falsetta*).) But the statute also calls for exclusion under Evidence Code section 352 if the trial court, in its discretion, concludes evidence of prior sex crimes is unduly prejudicial. (*People v. Cordova* (2015) 62 Cal.4th 104, 132 [trial court has discretion to exclude prior sex offense evidence if "its prejudicial effect substantially outweighs its probative value in showing the defendant's disposition to commit the charged sex offense or other relevant matters"].)

Defendant argues that the trial court abused its discretion in admitting the Sharon T. and Crystal T. incidents because they were unduly prejudicial. We find no abuse of discretion.

The prior sex offenses were similar enough to those charged in this case that the jury could reasonably draw an inference of propensity to commit crimes of this nature. (See *Falsetta*, *supra*, 21 Cal.4th at pp. 912, 915, 917 [evidence of any prior sexual offense is considered relevant under Evid. Code, § 1108, but its probative value is increased by relative similarity of the crimes, among other factors].) Defendant's molestation of Crystal, like Michael Lyons a small child, involved the same acts charged in this case: oral copulation and sodomy or attempted sodomy.[4] And defendant forced Sharon to orally copulate him by holding a long knife to her neck, threatening force similar to that by which Michael was later killed and, inferentially, threatened. Both offenses were proven by evidence independent from that implicating defendant in the assault on Michael, and neither was very remote in time. The prior offenses' value in proving a propensity for crimes of the kind charged was thus substantial. (See, e.g., *People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 825–826 (*Daveggio*); *People v. Williams* (2016) 1 Cal.5th 1166, 1196–1197 (*Williams*); *Jones*, *supra*, 54 Cal.4th at pp. 50–51; *People v. Loy* (2011) 52 Cal.4th 46, 62–63 (*Loy*).)

On the prejudice side of the scale, although defendant's prior sexual crimes were certainly capable in themselves of causing emotional reactions in jurors, neither was especially inflammatory in comparison with the charged offenses. Because defendant had already been convicted in both incidents, there

---

[4] Although the jury ultimately was unable to reach a verdict on the charge of oral copulation of Michael, the court could not anticipate that outcome when ruling on admissibility of the prior crimes. The People presented evidence suggesting oral copulation, though the jury ultimately did not unanimously find that evidence convincing beyond a reasonable doubt.

was no danger of extensive "minitrials" on the prior incidents and the jury here would not have been tempted to use this proceeding to punish him for his past acts. Nor was this a case in which defendant's guilt for prior incidents was used to shore up a weak case on the current charges; the evidence that defendant sexually assaulted and killed Michael was strong, if circumstantial. (See *Daveggio*, *supra*, 4 Cal.5th at pp. 825–826; *Williams*, *supra*, 1 Cal.5th at p. 1197; *Jones*, *supra*, 54 Cal.4th at p. 51; *Loy*, *supra*, 52 Cal.4th at pp. 61–62; *Falsetta*, *supra*, 21 Cal.4th at p. 917.) On balance, we cannot say the trial court abused its discretion under Evidence Code section 352 in admitting evidence of defendant's prior sexual offenses against Sharon and Crystal under Evidence Code section 1108.

Defendant points out that his kidnapping of Sharon was not itself a sexual offense as defined in Evidence Code section 1108, subdivision (d)(1), even though the kidnapping occurred immediately following the sexual assault. But evidence of the kidnapping was, in any event, properly admitted under Evidence Code section 1101, subdivision (b). That provision clarifies that the usual prohibition on propensity evidence does not preclude the admission of evidence relevant "to prove some fact . . . other than [the person's] disposition to commit such an act," such as the person's "motive, opportunity, intent, preparation, plan, knowledge, [or] identity." (*Ibid*.) Here, the evidence was relevant to prove defendant's premeditated intent to kill Michael when he abducted him and to show the existence of a common design or plan involving kidnapping sexual assault targets and taking them to the Feather River bottoms area to

assault and kill them with a knife.[5] (See *People v. Ewoldt* (1994) 7 Cal.4th 380, 402–403 (*Ewoldt*) [outlining the degrees of similarity required for relevance on intent and common design or plan under Evid. Code, § 1101, subd. (b)].)

Again, the facts showed that defendant gained control over Sharon by telling her that he wanted to talk to her about a real estate project. He then sexually assaulted her and kidnapped her by threatening her with a long knife to her throat; en route to the river, he indicated he intended to kill her there. This evidence tends to prove that defendant harbored the same lethal intent when he abducted Michael, whom he later killed by cutting his throat with a long knife. (See *Daveggio*, *supra*, 4 Cal.5th at p. 827; *People v. McCurdy* (2014) 59 Cal.4th 1063, 1098; *People v. Soper* (2009) 45 Cal.4th 759, 779, fn. 15.) In addition, the similarities between Sharon's kidnapping and threatened murder and Michael's kidnapping and murder in choice of weapon (long knife) and location (driving victim to river bottoms area) are sufficient to make the prior incident relevant to show a common design or plan, which was in turn relevant to show Michael was in fact kidnapped. (See *Ewoldt*, *supra*, 7 Cal.4th at p. 403 ["To establish the existence of a common design or plan, the common features must indicate the existence of a plan rather than a series of similar spontaneous acts, but the plan thus revealed need not be distinctive or unusual."]; see also *ibid.* [prior molestation of victim's older sister relevant on common plan where molestations occurred at similar time and place and the defendant offered a similar excuse for his actions

---

[5] As with oral copulation (see *ante*, fn. 4), the fact that the jury later failed to reach a verdict on the kidnapping charge does not affect the correctness of the court's ruling on admissibility of evidence to prove that charge.

in both cases]; *People v. Jackson* (2016) 1 Cal.5th 269, 304 [evidence tended to show the defendant "had a common plan of attacking elderly women late at night while they were alone in their homes in his neighborhood, with the purpose of sexually assaulting them"]; *People v. Davis* (2009) 46 Cal.4th 539, 603 (*Davis*) [in each case, "defendant abducted a stranger, a female; used a weapon; assured the victim that he would not harm her; took her to a remote location; and carried bindings with him, indicating that the behavior was planned"].) The kidnapping evidence was thus admissible under Evidence Code section 1101, subdivision (b), and, for the reasons already given, the trial court did not abuse its discretion in declining to exclude the evidence under Evidence Code section 352.[6]

Defendant next contends the admission of his prior crimes under Evidence Code section 1108 violated his rights of due process and a fair trial under the United States Constitution. We have previously upheld section 1108's exception from the bar on propensity evidence against similar challenges. (*Loy*, *supra*, 52 Cal.4th at pp. 60–61; *Falsetta*, *supra*, 21 Cal.4th at pp. 912–922.) Defendant makes no compelling argument for reconsidering our prior holdings. He relies for support on *McKinney v. Rees* (9th Cir. 1993) 993 F.2d 1378, 1384–1386, which found that the use of propensity evidence in that case

---

[6] The jury was instructed, with a modified version of CALJIC No. 2.50, that any evidence of a prior kidnapping could not be considered as proving bad character or criminal disposition, but only on intent, motive, or common plan or scheme. Defendant contends this cautionary instruction was ineffective, but he provides no grounds to believe the jury could not or did not follow the instruction. (See *People v. Mooc* (2001) 26 Cal.4th 1216, 1234 [jury is assumed to follow court's instructions].)

deprived the criminal defendant of a fair trial. But the Ninth Circuit later explained in *U.S. v. LeMay* (9th Cir. 2001) 260 F.3d 1018, 1026, that a constitutional violation of the kind found in *McKinney* occurs only when the "prejudicial effect [of the propensity evidence] far outweighs its probative value." Rejecting a facial challenge to the then-recently promulgated rule 414 of the Federal Rules of Evidence (28 U.S.C.), which allows evidence of prior child molestations when a defendant is accused of that crime, the *LeMay* court relied on rule 403, which calls for the exclusion of unduly prejudicial evidence. (*LeMay*, at pp. 1026–1027.) In *Falsetta*, we similarly relied on Evidence Code section 352 to reject a facial challenge to Evidence Code section 1108, and similarly distinguished *McKinney* as involving the admission of inflammatory character evidence with little or no probative value, even as to the defendant's propensity to commit sexual offenses. (*Falsetta*, at pp. 916–918, 921–922.) Here, we have already held that admission of defendant's prior crimes was not unduly prejudicial under Evidence Code section 352. The admission of the evidence thus did not violate defendant's constitutional rights.

## V.     Exclusion of Evidence of Witness's Prior Conviction

Defendant's next claim of error concerns the trial court's exclusion of evidence that defense witness Bobbie Lemmons had suffered a prior conviction. Lemmons, a river bottoms resident who testified to finding the victim's shoes and pants, had been convicted in 1992 of annoying or molesting a child, a misdemeanor. (Pen. Code, § 647.6.) The only information in the record about the nature of the conviction comes from the prosecution's motion in limine to exclude the conviction, which

notes that the conviction stems from an incident in which Lemmons admitted "to putting his hand down his daughter's pants, and when she protested he stopped."

In an Evidence Code section 402 hearing on admissibility held before Lemmons testified, defense counsel asked Lemmons whether he had suffered a conviction for misdemeanor child molestation. The prosecutor objected that the prior conviction was inadmissible either as impeachment or under section 1101 or 1108 of the Evidence Code. Defense counsel argued he could impeach Lemmons, his own witness, because Lemmons's expected testimony would be adverse to defendant and because the defense theory of the case implicated Lemmons in Michael's death. The court denied admission of the conviction as impeachment, finding that counsel had not yet demonstrated Lemmons's testimony would be adverse to defendant.[7]

Court and counsel revisited the issue after Lemmons's testimony. Defense counsel now argued the conviction was admissible not as impeachment but on a theory "likened to 1108 or 1101 conduct, which is relevant to show the possibility of another person committing the crime . . . ." The trial court adhered to its exclusion ruling, explaining that Evidence Code section 1108 applied only to a criminal defendant and that the lack of demonstrated similarity between Lemmons's past crime and the assault and murder of Michael precluded admission

---

[7] On appeal, defendant makes no argument for an impeachment theory of admissibility, though he describes the conviction as "impeachment evidence" in his section heading for this issue. And while he argues the conviction's exclusion violated his constitutional right to confront the witnesses against him, he does not grapple with the fact that Lemmons was called as a witness by the defense, not the prosecution.

under Evidence Code section 1101, subdivision (b), to prove some fact in issue other than criminal disposition.

The trial court's ruling of inadmissibility was correct under the Evidence Code. By its terms, Evidence Code section 1108 applies only to a criminal defendant's prior sexual offenses. (*Id.*, § 1108, subd. (a) ["In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101 . . . ."].) As Lemmons was not on trial, his conviction could not be admitted to show a propensity to commit sexual offenses. Evidence Code section 1101, subdivision (b), does not contain the same textual limitation—it permits the admission of "evidence that *a person* committed a crime" for certain purposes, including to show the person's intent or the identity of a person responsible for a crime (italics added)—but Lemmons's prior conviction was not admissible for these statutorily enumerated purposes. Even if Lemmons's past act with his daughter might be thought sufficiently similar to the attack on Michael that it would have been relevant to intent (see *Ewoldt, supra*, 7 Cal.4th at p. 402), it was not admissible on that theory because Lemmons was not charged with the crimes against Michael Lyons and his intent was not at issue in the trial. The material issue to which defense counsel argued the conviction was relevant was not Lemmons's intent but the identity of the perpetrator: counsel argued the conviction would tend to show that Lemmons, rather than defendant, sexually assaulted and killed Michael. But "[f]or identity to be established, the uncharged misconduct and the charged offense must share common features that are sufficiently distinctive so as to support the inference that the same person committed both acts." (*Id.* at p. 403.) Here there

was virtually no resemblance between the crimes, much less the high degree of shared features needed for prior crimes to be admissible on identity.

Defendant contends exclusion of the conviction showed judicial bias amounting to a due process violation. He argues it was unconstitutional to admit his own convictions while excluding that of a third party on whom he wished to cast suspicion for the crimes: "If propensity evidence was admissible against appellant, it violated due process to exclude the same with respect to Mr. Lemmons."

Defendant failed to establish the foundation for his claim of constitutionally unequal treatment. At trial, defendant did not argue for admission of Lemmons's conviction on the constitutional ground he now asserts.[8] The record therefore contains neither the full factual basis for a balancing of prejudice and probativeness under Evidence Code section 352, nor any indication that the trial court conducted such a weighing. Nor is it clear from the limited facts available that the consumption of time and danger of confusing the issues involved in litigating the details of Lemmons's prior offense would have been sufficiently counterbalanced by its probative value in showing his propensity to commit offenses like that

---

[8] We assume for the purpose of discussion that defendant's constitutional claim is not forfeited. A constitutional objection not made at trial may be considered on appeal to the extent it merely posits an additional legal consequence from the asserted error. (*People v. Partida* (2005) 37 Cal.4th 428, 435–439.) Whether defendant's constitutional claim falls within this rule or instead rests on "a reason not included in the actual trial objection" (*id.* at p. 438) is a somewhat difficult question, one we leave unresolved in favor of a decision on the merits.

committed against Michael. But as discussed earlier (*ante*, pt. IV.), Evidence Code section 1108 allows a defendant's prior sexual offenses to be introduced as propensity evidence only if the evidence is not unduly prejudicial in comparison to its probative value. Defendant has thus failed to establish that Lemmons's conviction would be admissible under Evidence Code section 1108 even if that statute were extended to nondefendants. His claim of unconstitutional unfairness in exclusion of the conviction therefore fails. (See *People v. Prince* (2007) 40 Cal.4th 1179, 1242–1243 [exclusion of third-party culpability evidence lacking significant probative value in comparison to its danger of distraction and consumption of time is not a constitutional violation]; *People v. Hall* (1986) 41 Cal.3d 826, 834 [even where relevant to establish reasonable doubt, third-party culpability evidence is subject to exclusion under Evid. Code, § 352].)

## VI. Guilt Phase Prosecutorial Misconduct

Defendant contends the prosecutor committed egregious misconduct in examining witnesses and in closing argument, depriving defendant of a fair trial in violation of his due process rights.

Prosecutorial misbehavior "violates the federal Constitution when it comprises a pattern of conduct 'so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.' [Citations.] But conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves ' "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." ' " (*People v. Espinoza* (1992) 3 Cal.4th 806, 820; accord, *People v.*

*Hill* (1998) 17 Cal.4th 800, 819.) We conclude there was no prejudicial misconduct under either federal or state law.

First, defendant asserts the prosecutor improperly insinuated to the jury that defendant acted immorally and created a threat to the Yuba City community by habitually and illegally driving his truck over the river levees, potentially causing them damage. The relevant exchange occurred during defendant's testimony. After defendant agreed with the prosecutor's supposition that going over the levees is illegal "because it tears up the levees and might cause the levees to break," the prosecutor continued: "Is there some reason you persist in doing this when it's dangerous to the whole community?" A defense objection ("speculation") was sustained as to the form of the question, and the prosecutor rephrased: "Is there some reason you[,] when you know this is dangerous[,] that you continue to do it?" Defendant answered that it is "not necessarily dangerous" and that "everybody does it." When the prosecutor continued with a question about a levee break and flood that occurred in 1996, defense counsel objected on grounds of relevance, and the prosecutor withdrew the question, but went on to say: "[W]ell, I guess what I'm getting at is you just don't care about other people." The court sustained a defense objection to the form of the question and the prosecutor moved on to another topic.

In this series of questions, the prosecutor explored a legitimate area for cross-examination: the nature of defendant's activities in the river bottoms. On direct, defendant had testified to his affinity for the river bottoms and for driving his four-wheel drive truck in the area, describing activities that were either innocent or, at least, had no direct victims: driving

around on the challenging terrain, fishing, "goofing off" with friends or by himself, and doing drugs. The prosecutor's questions about the antisocial nature of four-wheel driving over the levees constituted impeachment on this point, though its value as impeachment was very slight. The inference created by the question was also weak and attenuated, but not entirely illogical, and the evidence produced was by no means inflammatory. The cross-examination thus was not, as defendant asserts, irrelevant questioning intended to inflame the jury's passions, and it created no fundamental unfairness. To the extent the prosecutor's questioning about the levees could be deemed a deceptive or reprehensible method of cross-examination (*People v. Hill*, *supra*, 17 Cal.4th at p. 819), prejudice was not reasonably likely. (*People v. Watson*, *supra*, 46 Cal.2d at p. 836.)

Second, defendant maintains the prosecutor committed misconduct by eliciting an answer from Sheriff's Sergeant Harris, who was on the patrol boat when defendant was arrested, to the effect that given defendant's situation—stuck as he was in the mud with a rising river—Harris thought defendant should have been happy to see the patrol boat. In an earlier hearing out of the jury's presence, the court had ruled that Harris could describe defendant's reaction to the boat's arrival and could relate his own observations about the rising water, but could not say defendant's reaction went against his expectations. After establishing that defendant seemed to Harris unenthusiastic about the boat's arrival, the prosecutor asked, "Did it appear to you that he was in any kind of predicament at that point?" Harris answered: "Yes. Under the circumstances, his lack of enthusiasm caught my attention due to the fact he was in quite some peril there and his pickup being

in the location it was and the river rising and weather and the fact that he was stuck would have actually—I thought he—to the contrary, that he would be very glad to see us."

There was no prosecutorial misconduct. Although Harris's answer may have gone beyond the limit set by the court, the prosecutor's question did not call for Harris to give such an answer and there is no indication the prosecutor instructed or expected Harris to give it. (Cf. *People v. Warren* (1988) 45 Cal.3d 471, 482 [prosecutor who expects witness may give an inadmissible answer must warn witness].)

Third, defendant contends the prosecutor exceeded the scope of proper rebuttal in his final argument to the jury by expressing skepticism that defendant could have walked around 10 miles in wet conditions, wearing old, "cruddy" shoes, without getting blisters on his feet. We disagree. Though defense counsel spent most of his closing argument pointing to purported weaknesses in the prosecution case and suggesting that someone else (for example, Bobbie Lemmons) might have been the killer, he also maintained that defendant's testimony was consistent and believable. And since defendant had no alibi for the period of Michael's killing, the defense claim of innocence depended critically on the believability of defendant's account of his actions during that time. It was fair rebuttal for the prosecutor to point out implausible aspects of that account.[9]

---

[9] Defendant also suggests the prosecutor's argument introduced facts not in evidence. But attorneys may urge inferences from the evidence, as the prosecutor did in suggesting that walking 10 miles in those conditions would have resulted in injury to defendant's feet.

Finally, defendant complains of the prosecutor's argument that the large, dilute bloodstain on defendant's shirt must have come from Michael because defendant's scratches would not have produced such a significant amount of blood. Defendant maintains this argument contradicted the testimony of the prosecution DNA expert. (See *People v. Hill*, *supra*, 17 Cal.4th at p. 823 ["Although prosecutors have wide latitude to draw inferences from the evidence presented at trial, mischaracterizing the evidence is misconduct."].) The record does not support defendant's claim. The expert testified that DNA obtained from the shirt matched defendant rather than the victim, but also made clear that the DNA did not necessarily come from the bloodstain, which was very faint and appeared diluted; it could instead have come from skin cells deposited by the person wearing the shirt. The prosecutor thus urged fair inferences from the evidence in arguing that although the DNA was defendant's because he was wearing the shirt, the blood (which defendant had tried to wash out of the shirt) came from the victim's many terrible wounds.

## VII. Instruction on Circumstantial Evidence

Defendant contends a reference to "innocence" in a standard instruction on evaluating circumstantial evidence (CALJIC No. 2.01) improperly suggested to the jury that it was his burden to prove his innocence rather than the People's burden to prove guilt beyond a reasonable doubt.[10] We have

---

[10] In his opening brief, defendant also complained of the use of the term "innocent" in CALJIC No. 1.00. In his reply brief, however, defendant acknowledges that, as the Attorney General points out, the version of that instruction given here did not use the term.

previously rejected substantially identical challenges to this instruction, and defendant supplies no argument for reconsideration. "CALJIC No. 2.01 (concerning the sufficiency of circumstantial evidence) did not compel the jury to find defendant guilty and the special circumstance true using a standard lower than proof beyond a reasonable doubt. ([*People v.*] *Jones* [(2013)] 57 Cal.4th [899,] 972.) Nor did it create an impermissible mandatory presumption by requiring the jury to draw an incriminatory inference whenever such an inference appeared 'reasonable' unless the defense rebutted it by producing a reasonable exculpatory interpretation." (*People v. Casares* (2016) 62 Cal.4th 808, 831; accord, *People v. Delgado* (2017) 2 Cal.5th 544, 572–573.)

**Penalty Phase Issues**

## VIII. Mistrial Motion after Outburst by Victim's Stepfather

During defendant's testimony at the penalty phase of trial, Billy Friend, the victim's stepfather, suddenly shouted out, "You're going to die you slimy son of a bitch." The court immediately recessed, giving the jury its ordinary admonition not to form an opinion or discuss the case. Defendant moved for a mistrial, describing Friend's outburst as, in effect, testimony that the defense had no opportunity to impeach with Friend's prior convictions and evidence of "rancor" in the family before Michael's death. The court found Friend in contempt, ordered him to refrain from any more untoward conduct, and denied the mistrial. When the jurors and alternates reentered, the court addressed them as follows:

"All right. The Court will note for the record that all of the jurors have now entered the courtroom. And first of all, the

Court wants to tell you all that you heard, I'm sure, an outburst that occurred in this court just before we took the recess.

"If you'll recall both before, during, et cetera, any time I've had contact with you, I've indicated time and time again that your judgment in the case is to be based on only evidence that comes from that witness stand and such documentary or physical evidence that the Court admits into evidence. Obviously I did not say that includes any outburst from somebody in the larger area of the courtroom.

"I run a public courtroom as long as I have, and so long as I can do it within my power this is going to be a public courtroom and anybody can come in. And they're supposed to act like ladies and gentlemen. When they don't, we have the kind of thing that occurred here today.

"The assurance I want from all 16 people in front of me is that you're not going to let that matter influence your decision in any way. And in that regard I'm instructing you you're not to allow it to influence you in any way.

"Now any one of the 16 of you who feel you could not follow that direction fully, I want you to please raise your right hand.

"Court sees no hands.

"Now also, this outburst can affect people in different ways. And any of you feel that either the outburst or anything up to right now has so badly affected you that you can't continue to be jurors and treat all parties to this litigation fairly? If you feel anything's happened in that regard, again please raise your hand.

"I see no hands. When I ask these questions I sometimes have a feeling that maybe jurors think well, I'm not supposed to

raise my hand, I'm going to cause a big stink if I do. That—big stinks are what courtrooms are all about. That's what brings matters into Court. And I'm not afraid to face any of them. So if you'd have answered—if you'd have raised your hand to either of those questions, please do so, because I seek honest opinions when I ask you questions.

"All right. I see no hands, and I thank you very much. And at this juncture I believe we should continue with the examination of Mr. Rhoades."

Defendant does not maintain that the People were responsible for Friend's outburst. In this circumstance—a spectator outburst not attributable to either party—a mistrial is called for only if the misconduct is so inherently prejudicial as to threaten defendant's right to a fair trial despite admonitions from the court. Prejudice is not presumed. (*People v. Chatman* (2006) 38 Cal.4th 344, 368–370; *People v. Cornwell* (2005) 37 Cal.4th 50, 87–88.) The situation here did not call for a mistrial. The hostile outburst by a family member of the victim exposed the jury to no information except the very fact of Friend's hostility, which would not have been surprising in itself, and Friend's inability to maintain the decorum of the courtroom. The court's careful admonition and inquiry elicited no suggestion any jurors would be unable to set aside the event in their deliberations. Under these circumstances, the court did not abuse its discretion in denying a mistrial.

## IX. Racially Discriminatory Use of Peremptory Challenges

Defendant contends the prosecution intentionally used its peremptory challenges to remove all African-Americans from the penalty retrial jury in violation of *Batson v. Kentucky* (1986)

476 U.S. 79 and *People v. Wheeler* (1978) 22 Cal.3d 258. The trial court concluded defendant failed to make out a prima facie case of discrimination and thus did not require the prosecutors to explain their reasons for the challenged strikes. Defendant contends this was error. And because the trial was conducted in 1999, he contends it is now too late to ask the prosecutors to explain why they struck the challenged prospective jurors. Defendant contends he is therefore entitled to reversal of the penalty judgment. We conclude the contention lacks merit.

"Both the state and federal Constitutions prohibit the use of peremptory challenges to remove prospective jurors based on group bias, such as race or ethnicity. (See *Batson v. Kentucky*[, *supra*,] 476 U.S. [at p.] 97 [(*Batson*)]; *People v. Wheeler*[, *supra*,] 22 Cal.3d [at pp.] 276–277 (*Wheeler*).) When the defense raises such a challenge, these procedures apply: 'First, the defendant must make out a prima facie case "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." [Citation.] Second, once the defendant has made out a prima facie case, the "burden shifts to the State to explain adequately the racial exclusion" by offering permissible race-neutral justifications for the strikes. [Citations.] Third, "[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination." [Citation.]' (*Johnson v. California* (2005) 545 U.S. 162, 168, fn. omitted; see also *People v. Lewis* [(2008)] 43 Cal.4th [415,] 469.)" (*Davis*, *supra*, 46 Cal.4th at p. 582.)

The trial court here denied defendant's *Batson-Wheeler* motion at the first stage, finding he had not established a prima facie case. "Though proof of a prima facie case may be made

from any information in the record available to the trial court, we have mentioned 'certain types of evidence that will be relevant for this purpose. Thus the party may show that his opponent has struck most or all of the members of the identified group from the venire, or has used a disproportionate number of his peremptories against the group. He may also demonstrate that the jurors in question share only this one characteristic— their membership in the group—and that in all other respects they are as heterogeneous as the community as a whole. Next, the showing may be supplemented when appropriate by such circumstances as the failure of his opponent to engage these same jurors in more than desultory voir dire, or indeed to ask them any questions at all. Lastly, . . . the defendant need not be a member of the excluded group in order to complain of a violation of the representative cross-section rule; yet if he is, and especially if in addition his alleged victim is a member of the group to which the majority of the remaining jurors belong, these facts may also be called to the court's attention.' (*Wheeler*, *supra*, 22 Cal.3d at pp. 280–281, fn. omitted; see also *Batson*, *supra*, 476 U.S. at pp. 96–97 [in assessing a prima facie case, the trial court should consider 'all relevant circumstances,' including 'a "pattern" of strikes against black jurors' and 'the prosecutor's questions and statements during *voir dire* examination'] [citations].)" (*People v. Bell* (2007) 40 Cal.4th 582, 597 (*Bell*); accord, *People v. Scott* (2015) 61 Cal.4th 363, 384 (*Scott*).)

### A. Background

Each prospective juror for the penalty retrial completed a 162-question, 44-page questionnaire. On January 11, 1999, after hardship excusals, voir dire by the parties, and challenges

for cause, the parties exercised peremptory challenges on prospective jurors seated in the jury box, alternating their challenges until both sides accepted the jury, which was then sworn in. Attorney Michael B. Bigelow represented defendant in this process, while Prosecutors Frederick A. Schroeder and Susan E. Nolan, both from the Sutter County District Attorney's Office, represented the People.[11]

Defendant made his first *Batson-Wheeler* motion after the prosecutor struck three African-American women: Shirley R., Adrienne A., and Alice S. Noting that the prosecution had also used peremptory challenges against two White prospective jurors and that "there are a number of other jurors in the venire in the courtroom," the court denied the motion without prejudice to its renewal. The prosecution then excused two more White prospective jurors and a fourth African-American woman, Alicia R. The strike prompted a renewed defense motion.

Addressing the second *Batson-Wheeler* motion, the trial court noted that the prosecution had exercised four of its eight peremptory challenges against African-Americans. The court asked defense counsel what other circumstances supported his motion. Counsel responded that based on the juror questionnaires and voir dire, there were "no other discernable differences" between the struck jurors and those still in the box. Prosecutor Nolan replied, "Oh, I think there are significant differences," but when the court asked her to elaborate, she declined on the ground that the defense had not yet made a

---

[11]     Schroeder, the lead prosecutor, exercised the prosecution's peremptory challenges, but Nolan, who had also conducted some of the voir dire, participated in arguing the *Batson-Wheeler* motions.

prima facie case and the burden therefore had not shifted to the prosecution. Asked for specific similarities, defense counsel noted the following: "Relatives in prison"; "Formerly victims of assault"; "Strong religious views"; and "Volunteers somehow related to WEAVE" (an organization assisting survivors of domestic and sexual violence). The prosecutor responded that the defense needed to point to specific questions that the struck prospective jurors had answered the same way as those jurors the prosecutors had kept, but had not done so. With regard to the standard for finding a prima facie case, defense counsel maintained that he needed only to show that circumstances "raise an inference" of discrimination, while the prosecutor, citing *People v. Howard* (1992) 1 Cal.4th 1132, 1154 (*Howard*) (italics omitted), repeatedly argued a showing of a " 'strong likelihood' " was needed.[12]

The court denied defendant's second *Batson-Wheeler* motion under "the authority of this *Howard* case," but cautioned the prosecutors "that any further matters of this kind will weigh heavily on this Court." The court continued: "I'm very close, I'm going with *Howard* for the time being, but if I see very much more of this, I'm going to indicate to you, you may well have a

---

[12] In *Howard*, *supra*, 1 Cal.4th at pages 1153 to 1157, we upheld the trial court's ruling that no prima facie case had been established where the prosecutor had used two of his 11 challenges to strike the only two African-American prospective jurors tentatively seated in the jury box. We concluded the record of voir dire supported the trial court's finding that the defendant had not established a " 'strong likelihood' " of discrimination. (*Id.* at p. 1156.) As discussed below, we no longer apply a "strong likelihood" standard in evaluating whether the opponent of the strikes has established a prima facie case of discrimination.

serious problem on your hands." After defendant's second *Batson-Wheeler* motion was denied, the prosecution used three more peremptory challenges before both sides accepted the panel, with no further motions by the defense and no further comment on the record as to the jury's racial or ethnic composition.

Although the trial court did not explicitly say so, it appears from the lack of any contrary statement that at the time of defendant's second motion no other African-Americans were seated in the jury box; the Attorney General agrees on this point. Beyond that, the record does not make clear how many other African-Americans remained in the jury pool (the questionnaires do not record race or ethnicity), though the trial court's warning to the prosecutors against engaging in "any further matters of this kind" or "very much more of this," and its earlier remark that "there are a number of other jurors in the venire in the courtroom," suggest that the court believed some of the remaining prospective jurors were African-American or belonged to another racial or ethnic minority.

We briefly sketch the relevant questionnaire and voir dire answers given by the disputed prospective jurors:

In her juror questionnaire, Shirley R., a 60-year-old administrative assistant, declined to answer several questions about the death penalty, but indicated she had strong opinions about it; she thought the Biblical verse "an eye for an eye" has been "grossly misinterpreted and misused"; and she considered life in prison without the possibility of parole to be "more of a punishment than the death penalty." She responded "yes" to a question asking whether, given the choice between life in prison without parole or death for a person convicted of first degree

murder with special circumstances, she would always vote for life.

Under questioning by defense counsel, Shirley R. said that while she had strong opinions about the death penalty, "I would truthfully be able to consider both penalties after hearing the evidence." Asked by Prosecutor Schroeder whether she agreed that the death penalty was the appropriate punishment in some cases, she answered, "No, I can't truthfully say that," and explained, "I try to lead a Christian life, and my Bible says thou shalt not kill. It doesn't say give me any exceptions . . . ." On further questioning by the prosecutor, however, she backed off from an absolute position and agreed that the death penalty might be appropriate sometimes and she could impose it in what the prosecutor described as "just really a horrible case." Neither side challenged Shirley R. for cause.

Adrienne A., a 26-year-old customer service representative, stated she did not believe the death penalty served any purpose; that in "some or most" cases it is unnecessary; that she had not supported its reinstatement because "I can't support actions to kill a human as a sentence even if that individual has killed someone"; and that if she were making the laws, there would not be a death penalty. She nonetheless thought the death penalty was appropriate for premeditated murders and would not always vote for life without parole (or death) for a person convicted of first degree murder with special circumstances.

In answer to defense counsel's questions, Adrienne A. explained that while she had not seen the purpose of the death penalty in cases she had heard about, if she actually heard all the evidence and found it "the just verdict," she would vote for

it.  Questioned by the prosecutor, she affirmed her ability to impose death in an appropriate case, and both sides passed her for cause.

Alice S., a 36-year-old budget analyst, was the mother of a six-month-old infant.  She raised doubts as to whether caring for her baby would interfere with her ability to serve, noting that her husband travels "so I get very stressed at times."  She also thought serving in this case would touch on "a very sensitive area" for her because her brother had been convicted of a sexual offense; Alice S. believed her brother was innocent but due to his alcoholism "had no accountability the day of the alleged crime."  On questioning by Prosecutor Nolan, Alice S. clarified that she believed her brother had not committed the crime with which he was charged.  His alcohol use had resulted in his being "pretty much homeless," and as a result he "basically had no accountability."  If a person actually committed the crime, though, "they should be held responsible if there was alcohol or drugs and they're convicted."  Asked whether she could vote for a death sentence if she believed, after hearing all the evidence and the instructions on the law, that it was the appropriate sentence, she first said, "I can't really answer that."  But when the prosecutor clarified that she was not being asked whether she would vote for death in this case but only whether she could in a case where she thought it was the appropriate verdict, she answered, "Yes."  There was no challenge for cause.

Alicia R., the final African-American prospective juror struck by the prosecution, was 36 years old and worked in customer service.  In answers to the juror questionnaire, Alicia R. indicated that she had no strong opinions about the death penalty.  But asked about the Old Testament verse, "an eye for

an eye," she wrote she did not adhere to that view because "Christ died on the cross for everyone's sin." When asked whether her views on the death penalty had changed over time and why, she wrote: "Clara Fay Tucker has changed my position because she proved that some people can change."[13] Asked for her views on the statement "[a] defendant who is convicted of sexual assault and murder of a child should receive the *death penalty* regardless of the facts and circumstances of his background or mental state," Alicia R. indicated that it "[d]epends" on the facts of the case. But asked for her views on the statement "[a] defendant who is convicted of sexual assault and murder of a child should receive *life in prison without possibility of parole* regardless of the facts and circumstances of

---

[13] Karla Faye Tucker, who through media coverage of her impending execution "came to be known . . . as a soft-spoken, gentle-looking, born-again Christian pleading for mercy," was executed in Texas on February 4, 1998. (Verhovek, *Execution in Texas: The Overview; Divisive Case of a Killer of Two Ends as Texas Executes Tucker*, N.Y. Times (Feb. 4, 1998) p. A-1 <https://www.nytimes.com/1998/02/04/us/execution-texas-overview-divisive-case-killer-two-ends-texas-executes-tucker.html?rref=collection%2Ftimestopic%"2FTucker%2C%20Karla%20Faye&action=click&contentCollection=timestopics&region=stream&module=stream_unit&version=latest&contentPlacement=1&pgtype=collection> [as of Nov. 25, 2019].) Tucker had reportedly used drugs since childhood (*id.*, p. A-20) and was "[s]trung out . . . on a variety of drugs" at the time of the killings. (Verhovek, *As Woman's Execution Nears, Texas Squirms*, N.Y. Times (Jan. 1, 1998) p. A-12 <https://www.nytimes.com/1998/01/01/us/as-woman-s-execution-nears-texas-squirms.html> [as of Nov. 25, 2019].) (All Internet citations in this opinion are archived by year, docket number, and case name at <https://www.courts.ca.gov/38324.htm>.)

his background or mental state," Alicia R. responded that she "[a]gree[d] somewhat."

In voir dire Prosecutor Schroeder asked whether, if Alicia R. "made that kind of mental decision that . . . the death penalty objectively appears to you to be the correct decision," she "would" vote for it. She replied, "I suppose." Neither side challenged Alicia R. for cause.

## B. Analysis

The trial court in this case applied the "strong likelihood" standard from *Howard* to determine that defendant had not established a prima facie case of discrimination. At the time the trial occurred in 1999, there was some confusion in the case law as to how, if at all, this standard differed from the "reasonable inference" standard articulated in other California cases. A few years after defendant's trial, this court granted review to resolve the issue in *People v. Johnson* (2003) 30 Cal.4th 1302, 1306, 1313–1318. In that case we ruled that both terms "refer to the same test, and this test is consistent with *Batson*." We went on to elaborate: "Under both *Wheeler* and *Batson*, to state a prima facie case, the objector must show that it is more likely than not the other party's peremptory challenges, if unexplained, were based on impermissible group bias." (*Id.* at p. 1306.)

The United States Supreme Court, in turn, granted review to consider the issue and disapproved *People v. Johnson*'s " 'more likely than not' " standard. (*Johnson v. California*, *supra*, 545 U.S. at p. 168.) The high court explained that under *Batson*, the trial judge should "have the benefit of all relevant circumstances, including the prosecutor's explanation, before deciding whether it was more likely than not that the challenge was improperly motivated." (*Johnson v. California*, at p. 170.)

To serve its function in the three-step process, the requirement for a prima facie case must not be "so onerous that a defendant would have to persuade the judge—on the basis of all the facts, some of which are impossible for the defendant to know with certainty—that the challenge was more likely than not the product of purposeful discrimination. Instead, a defendant satisfies the requirements of *Batson*'s first step *by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred*." (*Johnson v. California*, at p. 170, italics added.)

Because the trial in this case predated this court's decision in *People v. Johnson*, it is unclear whether the trial court understood the "strong likelihood" standard to mean "more likely than not." Nonetheless, the trial court presumably understood the standard to be somewhat more demanding than the "reasonable inference" standard, for which defendant had argued. In the category of cases involving jury selection before the high court clarified the prima facie case standard in *Johnson v. California*, this court has adopted a mode of analysis under which, rather than accord the usual deference to the trial court's no-prima-facie case determination, we "review the record independently to determine whether the record supports an inference that the prosecutor excused a juror on a prohibited discriminatory basis." (*People v. Kelly* (2007) 42 Cal.4th 763, 779; accord, *People v. Reed* (2018) 4 Cal.5th 989, 999 (*Reed*); *Davis, supra*, 46 Cal.4th at pp. 582–583; *Bell, supra*, 40 Cal.4th at p. 597.)

Here we consider whether the record supports an inference the prosecution excused one or more of the African-

American prospective jurors because of their race.[14] We consider "all relevant circumstances" in making that determination. (*Batson*, *supra*, 476 U.S. at pp. 96–97.) We have identified certain types of evidence as "especially relevant," including: "whether a party has struck most or all of the members of the venire from an identified group, whether a party has used a disproportionate number of strikes against members of that group, whether the party has engaged those prospective jurors in only desultory voir dire, whether the defendant is a member of that group, and whether the victim is a member of the group to which a majority of remaining jurors belong. [Citation.] We may also consider nondiscriminatory reasons for the peremptory strike that 'necessarily dispel any inference of bias,' so long as those reasons are apparent from and clearly established in the record." (*Reed*, *supra*, 4 Cal.5th at pp. 999–1000.)

We consider the showing defendant made at his second or renewed motion, as that presents the fuller record of facts and argument. Looking to the pattern of the prosecution's

---

[14] Defendant's briefing repeatedly notes that all the African-Americans called into the jury box and excused by the prosecution were women, but does not argue their sex should alter the *Batson-Wheeler* inquiry.

In supplemental briefing and at oral argument, defendant suggested the prospective jurors' sex is relevant because African-American women are subject to discrimination on the basis of stereotypes relating to both race and sex; defendant asserted that the prosecutors here must have engaged in such dual stereotyping. But discrimination in this context cannot be assumed; it must be demonstrated. Because defendants' efforts to demonstrate discrimination have, in substance, focused on the jurors' race rather than their sex, we likewise focus on the jurors' race in determining whether defendant established a prima facie case.

challenges, the record shows that at the time of defendant's renewed *Batson-Wheeler* motion the prosecutors had used four of their eight peremptory challenges to eliminate every African-American seated in the jury box. Because the juror questionnaires did not record racial or ethnic heritage, we cannot know how many African-Americans were in the entire venire or in the pool of prospective jurors remaining after hardship and cause excusals. We will assume with defendant, however, that the prosecutors' use of half their strikes against the four African-American prospective jurors was substantially disproportionate to the representation of African-Americans in the jury pool. Given the demographic makeup of the community from which the jurors were drawn, unless African-Americans were greatly overrepresented in the venire or received hardship and cause excusals at much lower rates than others, it is likely that they comprised substantially less than 50 percent of the pool.[15] (See *Scott, supra,* 61 Cal.4th at p. 384; *Bell, supra,* 40 Cal.4th at p. 597.)

Exercising our independent review on appeal, we are nonetheless persuaded that the totality of the circumstances surrounding the prosecution's use of peremptory challenges

---

[15] According to census data, African-Americans made up just under 10 percent of Sacramento County's population in 2000. U.S. Census Bureau, *Population of Sacramento County, California: Census 2010 and 2000 Interactive Map, Demographics, Statistics, Graphs, Quick Facts* <http://censusviewer.com/county/CA/Sacramento> [as of Nov. 25, 2019]. We take notice of the census data here in recognition of the possibility that the lack of on-the-record comment simply reflects that the pool's composition was apparent to court and counsel at the time. But we note that it was defendant's burden to make the record necessary to support his motion.

does not give rise to an inference of discrimination. As an initial matter, we note that this case "did not involve a situation in which '[r]acial identity between the defendant and the excused person,' or between the victim and the majority of remaining jurors, raises heightened concerns about whether the prosecutor's challenge was racially motivated." (*People v. O'Malley* (2016) 62 Cal.4th 944, 980.) Neither defendant nor the victim were African-American—both were White—and the record reveals no other case-specific reason why a prosecutor would be motivated to exclude a particular class of jurors. We caution that stereotypes and biases can influence jury selection in any case. But in the absence of such reasons, or of any indication these particular prosecutors habitually employed group bias in their selection of juries, we are less inclined to find a prima facie case based solely on the prosecutors' disproportionate use of peremptories against one group. (*Scott*, *supra*, 61 Cal.4th at p. 384; *Bell*, *supra*, 40 Cal.4th at pp. 597, 599.)

Furthermore, the record does not reveal any apparent disparities in the nature or extent of the prosecutors' questioning of the African-American prospective jurors versus prospective jurors of other racial and ethnic backgrounds. And, finally, the record discloses readily apparent, race-neutral grounds for a prosecutor to use peremptory challenges against each of the four prospective jurors at issue. (See, e.g., *Reed*, *supra*, 4 Cal.5th at pp. 999–1000.)

By referring to "readily apparent" grounds for the strikes, we do not mean merely that we can imagine race-neutral reasons the prosecutors might have given if required to do so at the second step of the *Batson* inquiry. As defendant and

Justice Liu's dissenting opinion quite rightly point out, the very purpose of *Batson*'s first step is to elicit the prosecution's actual reasons for exercising its strikes when other circumstances give rise to an inference of discrimination: "The *Batson* framework is designed to produce actual answers to suspicions and inferences that discrimination may have infected the jury selection process. [Citation.] The inherent uncertainty present in inquiries of discriminatory purpose counsels against engaging in needless and imperfect speculation when a direct answer can be obtained by asking a simple question." (*Johnson v. California, supra*, 545 U.S. at p. 172.) It follows that speculation about reasons the prosecutors *might* have had for striking the jurors would go beyond our proper role in assessing the prima facie case.

But our cases have also recognized that where the record reveals "*obvious* race-neutral grounds for the prosecutor's challenges to the prospective jurors in question," those reasons can definitively undermine any inference of discrimination that an appellate court might otherwise draw from viewing the statistical pattern of strikes in isolation. (*Davis, supra*, 46 Cal.4th at p. 584, italics added; accord, *People v. Taylor* (2010) 48 Cal.4th 574, 616.) Put differently, when the record of a prospective juror's voir dire or questionnaire on its face reveals a race-neutral characteristic that any reasonable prosecutor trying the case would logically avoid in a juror, the inference that the prosecutor was motivated by racial discrimination loses force. Therefore, as we have said, an appellate court may take into account "nondiscriminatory reasons for a peremptory challenge that are apparent from and 'clearly established' in the

record [citations] and that necessarily dispel any inference of bias." (*Scott*, *supra*, 61 Cal.4th at p. 384.)[16]

Here, the record reveals readily apparent reasons for the strikes that dispel the inference of bias. In particular, Shirley R. and Adrienne A. each expressed strong views against the death penalty on their questionnaires and in voir dire. On her questionnaire, Shirley R. wrote that she considered life in prison

---

[16] Our dissenting colleague appears to agree that an appellate court may consider such readily apparent reasons for a strike, though he may differ as to precisely how obvious an hypothesized reason must be to dispel any inference of biased selection. (Dis. opn. of Liu, J., *post*, at p. 19; see also *People v. Harris* (2013) 57 Cal.4th 804, 872–873 (conc. opn. of Liu, J.).)

We stress that in considering these grounds on appeal we do not suggest that a trial court evaluating a *Batson-Wheeler* prima facie case should search the record for reasons for the peremptory challenges instead of asking the attorney who exercised them for his or her reasons as part of a second-step inquiry. In the trial court, "a direct answer can be obtained by asking a simple question." (*Johnson v. California*, *supra*, 545 U.S. at p. 172.) But in this court, which may conduct its review of a no-prima-facie-case ruling many years or even decades after it was made, asking the attorneys would be anything but simple—indeed, both defendant and the dissent argue that it would be impossible here. (Dis. opn. of Liu, J., *post*, at p. 24 [only possible remedy for trial court's failure to ask question is to reverse penalty judgment]; see *People v. Johnson* (2006) 38 Cal.4th 1096, 1100–1104.) On the other hand, as an appellate court, we have the benefit of being able to examine the record in more detail, and at a great deal more leisure, than a trial court in the midst of jury selection. What is the soundest and most practical approach for trial courts is not necessarily the soundest and most practical approach for appellate courts, and vice versa.

without the possibility of parole to be "more of a punishment than the death penalty" and checked an answer indicating that given a choice of penalties, she would always vote for life; on questioning by the prosecutor, she averred that the Bible makes no exceptions to its commandment against killing and she could not "truthfully say that" she considered death the appropriate punishment in some cases. Adrienne A. wrote that the death penalty was often or usually unnecessary, that she did not believe it served any purpose, that she could not "support actions to kill a human as a sentence even if that individual has killed someone," and that if she were making the laws there would be no death penalty. Both women also gave some more nuanced answers in voir dire, declaring themselves able to impose a death sentence if warranted, such that they were not subject to a challenge for cause. But given their strongly stated views opposing the death penalty, the fact they were not subject to for-cause challenges did not render them desirable jurors for the prosecution in a penalty retrial.

Comparisons to the seated jurors the prosecution accepted do not negate the force of these readily apparent reasons for peremptory challenge.[17] It is true that both Juror No. 4 and

_____

[17] Although we have sometimes declined to consider such comparisons in a first-stage *Batson-Wheeler* analysis—particularly when neither the trial court nor this court, in evaluating the prima facie case, has posited possible prosecutorial reasons for the challenged strikes (*Bell, supra,* 40 Cal.4th at pp. 600–601; see also *People v. Bonilla* (2007) 41 Cal.4th 313, 350 [comparative analysis not mandated in first-stage cases])—more recent decisions have considered such comparisons. (See, e.g., *Reed, supra,* 4 Cal.5th at pp. 1002–1003; *People v. Harris, supra,* 57 Cal.4th at pp. 836–838.) These

Juror No. 9 expressed reservations about the death penalty that overlapped in certain respects with Shirley R.'s and Adrienne A.'s.[18]  But neither of these seated jurors expressed the sort of unqualified opposition to the death penalty that both Shirley R. and Adrienne A. did at times.   Two non-African-American prospective jurors who did express such unqualified anti-death-penalty views on their questionnaires were struck by the

---

cases recognize that comparative juror analysis has a role to play as an aid in determining whether the reasons we are able to identify on the record are ones that help to dispel any inference that the prosecution exercised its strikes in a biased manner.   Whether or not this evolution in jurisprudence demands we explicitly "repudiate[]" our earlier decisions (dis. opn. of Liu, J., *post*, at p. 20), we clarify here that juror comparisons can play a role at the first stage of the *Batson-Wheeler* analysis.

This case illustrates the utility of juror comparisons in conducting our independent appellate review of the first stage determination.  By comparing the excused jurors to those the prosecutor retained on the identified characteristics, we test the hypothesis that these characteristics were distinct enough to account for the challenge and dispel any inference of bias.

[18]     Juror No. 4 thought the purpose of the death penalty was to act as a deterrent to crime, but doubted "if it really works," checked "No" on a question asking specifically whether enforcing the death penalty deters crimes such as murder, and did not support it politically because "it takes too much money." Juror No. 9 was doubtful as to the penalty's deterrent value and thought life in prison without the possibility of parole "could be worse than death for some people."  Both these jurors were in the group initially seated in the box at the outset of peremptory challenges, meaning they were also seated when defendant's *Batson-Wheeler* motions were denied.  Neither of these jurors was African-American.

prosecution before defendant made his second *Batson-Wheeler* motion.

As to Prospective Juror Alice S., there were, as the Attorney General posits, two main "causes for concern" for a prosecutor: her uncertainty whether she would be able to serve as a juror while caring for her six-month-old infant (often on her own while her husband was away), and her belief that her brother had been wrongly convicted of a sexual offense. Both are readily apparent bases for objection from a prosecutorial view that tend strongly to dispel any inference of bias. While the jury being chosen would decide only penalty, the issue of lingering doubt remained one the jury would face; the jury was ultimately instructed it could consider lingering doubt and the defense argued for the lesser penalty partly on that basis. The penalty trial accordingly lasted about two months, during which the prosecutors asked the jurors to absorb and follow the evidence of guilt, most of it physical and circumstantial, in sufficient detail that they would not have lingering doubts as to defendant's responsibility. Having spontaneously expressed doubts about whether her need to care for her six-month-old infant would allow her to complete her jury service if selected, Alice S. was clearly not a good choice for this task.

With regard to her brother, Alice S. expressed the belief he was innocent of the crime and had been convicted only because, due to his alcoholism and resulting lack of housing, he could not account for his activities at the time of the crime. Given the evidence of defendant's substance abuse during the relevant timeframe and the nature of his lingering doubt defense, this response would have raised concerns for any reasonable prosecutor trying the penalty phase of this case.

58

Defendant points to no juror accepted by the prosecution who expressed similar doubts about his or her ability to serve or similar attitudes about the prosecution of a family member.[19]

Finally, Prospective Juror Alicia R. indicated on her questionnaire that her views on the death penalty were influenced by the highly publicized case of Karla Faye Tucker, a late Texas death row inmate who was well-known for having committed a capital crime while battling an addiction to drugs, and who had become a Christian while in prison; in Alicia R.'s view, Tucker "proved that some people can change." Answering a question seeking general information about prospective jurors' views on the death penalty, Alicia R. indicated that "an eye for an eye" is wrong because "Christ died on the cross for everyone's sin." She tended to agree with the statement "[a] defendant who is convicted of sexual assault and murder of a child should receive *life in prison without possibility of parole* regardless of the facts and circumstances of his background or mental state," while remaining noncommittal regarding her view of imposing the death penalty in such a case. Asked whether she would have a death penalty if she were making the laws, Alicia R. responded, "can't say." Alicia R.'s responses revealed a view of

---

[19] As the dissent observes, Alice S. clarified that she did not regard substance abuse as an excuse for crime. (Dis. opn. of Liu, J., *post*, at p. 13.) The readily apparent concern about Alice S., however, was not her attitude toward substance abuse generally, but that she believed her brother's alcoholism led to his wrongful conviction by rendering him incapable of supplying an alibi. From any reasonable prosecutor's perspective, this belief created a clear risk that Alice S. might be especially receptive to the alibi defense put forward by defendant, who claimed to be taking drugs during the period when the victim was abducted and killed.

the proper role of the death penalty, and a strong belief in the possibility of redemption for persons who commit even the most serious crimes, that would naturally have raised serious concerns for any prosecutors selecting the penalty retrial jury in this case.

Defendant points to no other juror whom the prosecution accepted who appeared to hold similar attitudes toward the death penalty, particularly for a crime like defendant's. Seated Juror No. 4 did write that the death penalty might be inappropriate for some people convicted of sexually assaulting and murdering a child because "some persons may benefit from rehabilitation." But in contrast to Alicia R., Juror No. 4 also indicated that she disagreed with the statement "[a] defendant who is convicted of sexual assault and murder of a child should receive *life in prison without possibility of parole* regardless of the facts and circumstances of his background or mental state." Furthermore, Juror No. 4—unlike Alicia R.—had specifically identified the "[k]illing of a child" as a crime for which she believed the death penalty might be the appropriate sentence.

Only one other seated juror, Juror No. 7, expressed even qualified agreement with the statement that a defendant convicted of sexual assault and murder of a child should be sentenced to life without parole regardless of the circumstances. But unlike Alicia R., Juror No. 7 also said that such a defendant should be sentenced to *death* regardless of the circumstances. Juror No. 7's attitudes toward the appropriate penalty for this type of crime were further revealed by her responses to other questions: Unlike Alicia R. (but like Juror No. 4), Juror No. 7 specifically identified "[k]illing of a child" as a crime for which the death penalty may be appropriate. Finally, unlike Alicia R.,

who "[couldn't] say" whether she would have the death penalty if she were making the laws, Juror No. 7 affirmatively indicated that she *would* have a death penalty "to keep repeat offenders from society." For the prosecution, conducting the penalty retrial of a repeat offender convicted of sexually assaulting and murdering a child, the difference between the two prospective jurors' responses would have been highly significant.

The dissent stresses that the prosecution here did not challenge Shirley R., Adrienne A. or Alicia R. for cause, questioning how we can then find their anti-death-penalty views to be obvious grounds for their excusal by peremptory challenge. (Dis. opn. of Liu, J., *post*, at p. 15.) The two questions, though, are entirely distinct. "Unlike a for-cause challenge . . . , the issue here is not whether a juror held views that would impair his or her ability to follow the law. Unimpaired jurors may still be the subject of valid peremptory strikes." (*People v. Armstrong* (2019) 6 Cal.5th 735, 773.) A prospective juror's attitude toward the death penalty is a common basis for *both* cause and peremptory challenges, and an advocate who finds a juror undesirable on that basis but is unable to have him or her excused for cause is expected to use a peremptory challenge to remove the juror. (See *People v. Coleman* (1988) 46 Cal.3d 749, 767–770.) It is entirely plausible that the prosecutors believed they were unlikely to succeed with for-cause challenges here, but felt nonetheless that the three women's views on the death penalty made them undesirable jurors in a penalty trial.

Notwithstanding the various circumstances tending to dispel any inference of discrimination in this case, defendant contends the high court's decision in *Johnson v. California* compels a prima facie case finding here. Defendant relies

largely on a brief paragraph in which the high court noted that the inferences of discrimination that had led the trial court in that case to tell the parties " ' "we are very close" ' "—and that had also led this court to describe the prosecution's pattern of strikes as " 'suspicious' "—were "sufficient to establish a prima facie case under *Batson*." (*Johnson v. California, supra*, 545 U.S. at p. 173.) Defendant argues the same result should obtain here, since this case involves a similar pattern of strikes against African-American prospective jurors and a similar statement by the trial judge about being "close."

To the extent defendant argues that *Johnson v. California* requires us to find a prima facie case based on the pattern of strikes alone, we are unpersuaded. It was not the pattern of strikes alone that gave rise to the inference of discrimination in *Johnson v. California*; context mattered as well. *Johnson v. California*, unlike this case, "involved the 'highly relevant' circumstance that a black defendant was 'charged with killing "his White girlfriend's child." ' " (*Johnson v. California, supra*, 545 U.S. at p. 167, quoting *People v. Johnson, supra*, 30 Cal.4th at p. 1326.) Although defendant suggests otherwise, nothing in the high court's opinion indicates any disagreement with the proposition that the racially charged nature of a case may properly inform an appellate court's consideration of whether a pattern of strikes establishes a prima facie case of discrimination.[20] Nor does the high court's opinion suggest that

---

[20] Indeed, no party in *Johnson v. California* asked the court to make any such ruling. On the contrary, the defendant in that case strongly urged the court to consider the racially charged nature of the case. (*Johnson v. California* (U.S. Supreme Ct., Feb. 2, 2005, No. 04-6964) Petitioner's Brief on the Merits, p. 48.)

other factors—such as discrepancies in the extent or quality of questioning, or readily apparent race-neutral reasons for exercising the strikes—are irrelevant to the inquiry.

Defendant and our dissenting colleague argue that the high court in *Johnson v. California* did at least imply that such reasons are irrelevant by failing to address any of them. (Dis. opn. of Liu, J., at pp. 11, 15–16.) Although the trial court in that case had hypothesized certain race-neutral reasons for the peremptory challenges—"that the black venire members had offered equivocal or confused answers in their written questionnaires" (*Johnson v. California, supra,* 545 U.S. at p. 165)—the high court did not mention those reasons in addressing whether a prima facie case was established. But the omission is not significant, because the reasons themselves were not significant. Of the three disputed prospective jurors in *Johnson v. California*, one gave what the trial court described as a " 'rambling' " response that suggested difficulty in understanding, the second answered a question according to her " 'emotions and feelings,' " and no reason was posited for the third. (*People v. Johnson, supra,* 30 Cal.4th at pp. 1307–1308.) It is neither surprising nor meaningful that the trial court's assessment that a prospective juror was "rambling" or acting on her "feelings" played no role in the high court's brief prima facie case discussion. Unlike jurors' uncertainty or equivocation about their ability to apply the death penalty, this type of unsatisfactory response was not the sort of readily apparent reasons for a prosecutorial juror strike that would have

dispelled any inference of discrimination arising from the pattern of excusals.[21]

Nor, contrary to the argument made by defendant and the dissent, does the trial court's comment here ("I'm very close, I'm going to go with *Howard* for the time being, but if I see very much more of this, I'm going to indicate to you, you may well have a serious problem on your hands.") amount to a finding that the circumstances gave rise to an inference of bias. Although defense counsel had argued that only an inference of bias was needed for a prima facie case, the trial court never addressed that standard. And although *Wheeler* had used both phrases—"strong likelihood" and "reasonable inference" (*Wheeler, supra,* 22 Cal.3d at pp. 280–281)—our decision there did not identify them as different levels of proof. Nor did *Howard*, the decision by which the trial court was mainly guided. (See *Howard, supra,* 1 Cal.4th at pp. 1153–1157 [quoting *Wheeler*'s strong-likelihood language without mentioning reasonable inference as an alternative].) The trial court's statement appears to have been intended as a warning to the prosecutors to be careful with their future peremptories, because additional strikes might lead to a finding of a prima facie case of discrimination. It is not clear the trial court meant

---

[21] For this reason, we disagree with the dissent's suggestion that the answers given by the prospective jurors in this case were equivocal or confused in the same way as those in *Johnson v. California.* (Dis. opn. of Liu, J., *post,* at pp. 15–16.)

The dissent (p. 11) also notes that our opinion in *People v. Johnson, supra,* 30 Cal.4th at pages 1325 to 1326, suggested some reasons that could have supported a peremptory challenge to the third disputed prospective juror. These, too, fall short of the kind of readily apparent reasons that would lead any reasonable prosecutor to challenge a juror.

it as a commentary on how suspicious (or not) the prior strikes had been, given the totality of the circumstances, nor is it apparent that the court implied the existence of a prima facie case under a "reasonable inference" standard. In any event, our review of the court's ruling in this case is independent; it is not necessary for us to determine precisely why the trial court denied the motion or what changes in the law or facts would have led it to grant the motion.

In sum, considering all the relevant circumstances, we conclude the record does not "support[] an inference that the prosecutor excused a juror on a discriminatory basis." (*Reed, supra*, 4 Cal.5th at p. 999.) Although the prosecutors used half their peremptory challenges to excuse all the African-American prospective jurors seated in the box, this was not a case that raised heightened concerns about racial bias in jury selection. There were no apparent differences in the extent or manner of the prosecutors' questioning of prospective jurors of different racial backgrounds. And, most importantly, the record discloses readily apparent grounds for excusing each prospective juror, dispelling any inference of bias that might arise from the pattern of strikes alone.[22] Our independent review of the record leads to the conclusion that defendant failed to establish a prima facie case of unconstitutional discrimination.

---

[22] No different conclusion would follow from examination of the record at the time of defendant's first *Batson-Wheeler* motion. The pattern of strikes was similar (three out of five challenges used against African-Americans) and grounds for prosecutorial challenge were readily apparent as to all three struck prospective jurors (Shirley R., Adrienne A., and Alice S.).

## X. Denial of Defense Challenge for Cause

Defendant contends the trial court erred in denying his challenge for cause to a juror who, he asserts, bore an impermissible bias in favor of the death penalty. Defendant contends the error deprived him of his right to an unbiased jury drawn from a cross-section of the community in violation of the federal Constitution. We hold defendant did not preserve the issue for appeal and that it lacks merit in any event.

On her questionnaire, Juror No. 10 wrote that a juror should "listen carefully" and not "make up your mind before all evidence is in," and that she was willing to determine as best she could which sentence was appropriate, and to return that sentence. Asked generally for her opinions about the death penalty, she wrote: "I am in favor of it when it involves children." If she were making the laws, she would have a death penalty. She agreed with the statement that a defendant convicted of sexual assault and murder of a child should receive the death penalty "regardless of the facts and circumstances of his background or mental state."

On questioning by defense counsel, the juror reiterated her view that the death penalty was appropriate in cases involving children, but also indicated a willingness to consider evidence in mitigation even in such a case. When counsel asked whether she would "not consider" life without the possibility of parole in such a case, this colloquy ensued:

"A: It would be difficult for me to say, no, that they—life in prison. I couldn't go along with that always.

"Q: Why not?

"A:  Because of it being a child involved.  That's where I have my problem with this—

"Q:  Okay

"A:  —case

"Q:  So then, honestly, as you sit there, because a child was involved, life without possibility of parole is not something that you could honestly, that you could honestly, honestly—

"A:  Uh-hum.

"Q:  —deep down, that you could honestly consider?

"A:  Well, it would be difficult for me to do that.

"Q:  You—so you couldn't consider it honestly?

"A:  Well, honestly, I guess until I heard all the evidence myself, it would be difficult.

"Q:  Do you think—go ahead?

"A:  No.  I'm just, I would just—because it was a child involved, I'd have to do a lot of thinking on that.  But it depends on what the evidence is in their background."

On further questioning by defense counsel, Juror No. 10 appeared to say that because a child was involved, the defense would have to prove to her that life without parole was the appropriate sentence, even if the court instructed the jury that the defense did not have to prove anything.  The court, however, had counsel's question reread and asked the juror whether, having it in mind, she would follow the court's instructions.  She replied, "Yes, I would."

On renewed questioning by defense counsel, Juror No. 10 explained that while she was "leaning towards the death penalty" she "would have to listen to everything first before I

could definitively say for sure." After questioning by the prosecutor, in which the juror affirmed she would listen to the evidence and sentence defendant to life if she felt that was the appropriate penalty, the court pressed her on whether she would "really listen" to the factors in mitigation as well as those in aggravation, and on whether she could consider them in a fair fashion, without a predisposition to selecting the death penalty. She replied, "I honestly feel that I could [do] that," and, when the court asked if there was any question in her mind, she answered, "No."

The trial court denied defendant's challenge for cause. The court concluded that while the juror tentatively favored the death penalty based on the case synopsis she had read in the questionnaire, her answers on voir dire showed she would consider all the evidence in reaching her ultimate verdict. Defendant did not exercise a peremptory challenge against Juror No. 10 and did not exhaust his peremptories, using only 16 of the 20 allotted.

The Attorney General maintains that defendant has failed to preserve the issue of his for-cause challenge because he did not exhaust his peremptory challenges or express dissatisfaction with the jury that was seated. We agree. " 'To preserve a claim of error in the denial of a challenge for cause, the defense must exhaust its peremptory challenges and object to the jury as finally constituted.' (*People v. Millwee* (1998) 18 Cal.4th 96, 146.) Defendant did neither." (*People v. Hillhouse* (2002) 27 Cal.4th 469, 487 (*Hillhouse*).) Defendant here had four peremptory challenges remaining when he accepted the jury, one of which he could have used to excuse Juror No. 10. At the

time he accepted the jury, defense counsel said simply, "Pass the panel, Your Honor," giving no indication of dissatisfaction.

For the proposition that the issue of his challenge to Juror No. 10 must be deemed preserved, defendant relies on a single phrase in a United States Supreme Court decision on a different issue, *United States v. Martinez-Salazar* (2000) 528 U.S. 304. There the high court held that a defendant who *does* use a peremptory challenge to remove a prospective juror who should have been excused for cause has not been deprived of any right under federal court rules or the Constitution. (*Id.* at p. 307.) Rejecting the lower court's conclusion the defendant had been "compelled" to use a peremptory challenge against the prospective juror, the court stated that the defendant "had the option of letting [the prospective juror] sit on the petit jury and, upon conviction, pursuing a Sixth Amendment challenge on appeal." (*Id.* at p. 315.)

As we have previously explained, this passage does not establish that a California defendant can preserve a for-cause challenge issue without exhausting his or her peremptories and objecting to the panel. In *Martinez-Salazar*, "the high court interpreted *federal* law, specifically rule 24 of the Federal Rules of Criminal Procedure (18 U.S.C.), as not requiring a defendant to excuse a prospective juror in order to preserve the issue of the trial court's denial of a challenge for cause. (*United States v. Martinez-Salazar, supra*, 528 U.S. at pp. 314–315.) However, the court recognized that *state* law may be different. (*Id.* at pp. 313–314 [citing *Ross v. Oklahoma* (1988) 487 U.S. 81].) In *Ross v. Oklahoma*, at page 89, the court noted that under Oklahoma law, 'a defendant who disagrees with the trial court's ruling on a for-cause challenge must, in order to preserve the

claim that the ruling deprived him of a fair trial, exercise a peremptory challenge to remove the juror. Even then, the error is grounds for reversal only if the defendant exhausts all peremptory challenges and an incompetent juror is forced upon him.' The court found 'nothing arbitrary or irrational about such a requirement, which subordinates the absolute freedom to use a peremptory challenge as one wishes to the goal of empanelling an impartial jury.' (*Id.* at p. 90.) . . . [T]he California rule is similar to Oklahoma's." (*Hillhouse, supra,* 27 Cal.4th at p. 487; accord, *People v. Winbush* (2017) 2 Cal.5th 402, 426.) *Martinez-Salazar* casts no doubt on the continued validity of our rule requiring defendant to have taken additional steps to preserve the claim that his for-cause challenge was improperly denied.

We also reject defendant's claim on the merits. A challenge for cause under *Wainwright v. Witt* (1985) 469 U.S. 412, 424, requires the trial court to determine whether the prospective juror's views on the death penalty "would ' "prevent or substantially impair" ' the performance of the juror's duties as defined by the court's instructions and the juror's oath." (*People v. Cunningham* (2001) 25 Cal.4th 926, 975.) " 'On appeal, we will uphold the trial court's ruling if it is fairly supported by the record, accepting . . . the trial court's determination as to the prospective juror's true state of mind when the prospective juror has made statements that are conflicting or ambiguous.' (*People v. Mayfield* (1997) 14 Cal.4th 668, 727." (*People v. Barnett* (1998) 17 Cal.4th 1044, 1114; accord, *People v. Jenkins* (2000) 22 Cal.4th 900, 987; *People v. Winbush, supra,* 2 Cal.5th at pp. 424–425.)

Juror No. 10's statements were at times ambiguous and conflicting. On the one hand, she generally thought the death

penalty appropriate for sexual assault and murder of a child, and knowing from the synopsis on her questionnaire that defendant had been convicted of the "murder, torture, sodomy and sexual assault" of an eight-year-old boy, she leaned toward the death penalty in this case. On the other hand, she believed jurors should keep an open mind and listen to all the evidence and, under close questioning by attorneys for both parties and by the court, she affirmed that she would consider the mitigation evidence presented and could return a life sentence if she believed it appropriate. Although at one point she appeared to say that because the victim was a child she would put a burden of proof on the defense even if instructed otherwise, when questioned carefully by the court she clarified that she would follow the court's instructions on how to decide the penalty. The trial court was fully engaged in assessing the juror's state of mind on these points and was able to observe her tone of voice and demeanor. In these circumstances, we have no grounds to overturn the court's determination that Juror No. 10 was not disqualified by bias. Finding no error in this determination, we also reject defendant's claims to denial of his constitutional rights in this regard.

## XI. Permissibility of Penalty Phase Retrial

Defendant contends the retrial of penalty before a new jury after the original jury was unable to reach a verdict on this issue, as provided for in Penal Code section 190.4, subdivision (b), conflicts with evolving standards of decency in the United States and therefore violates the bans on cruel and/or unusual punishments under the United States and California

Constitutions. (U.S. Const., 8th Amend.; Cal. Const., art. I, § 17.)[23]

As in *People v. Taylor, supra*, 48 Cal.4th at page 633, defendant here cites statutory law from other United States jurisdictions to show that California is in the minority of death penalty jurisdictions allowing a penalty retrial and argues a retrial unfairly imposes double-jeopardy-type burdens on capital defendants. We rejected both arguments in *Taylor*: "Although we have never addressed the precise Eighth Amendment challenge defendant raises, we have determined that 'California's asserted status as being in the minority of jurisdictions worldwide that impose capital punishment' does not establish that our death penalty scheme per se violates the Eighth Amendment. [Citations.] Likewise here, that California is among the 'handful' of states that allows a penalty retrial following jury deadlock on penalty does not, in and of itself, establish a violation of the Eighth Amendment or 'evolving standards of decency that mark the progress of a maturing society.' (*Trop v. Dulles* (1958) 356 U.S. 86, 101.) [¶] Arguing points more typically raised in a claim of double jeopardy, defendant further contends that compelling a capital defendant to endure the ' "embarrassment, expense and ordeal" ' (*United States v. Scott* (1978) 437 U.S. 82, 95) of a second trial on the question of whether he should live or die is inconsistent with Eighth Amendment principles. But, as defendant concedes, in *Sattazahn v. Pennsylvania* (2003) 537 U.S. 101, 108–110, the high court held that the double jeopardy clause did not bar a penalty retrial after appellate reversal of the capital defendant's

---

[23] Defendant cites other constitutional guarantees as well but makes no distinct argument for their violation.

conviction, notwithstanding that in accordance with Pennsylvania law, the defendant had been sentenced to life without parole following juror deadlock at the penalty phase. Given that the double jeopardy clause permits retrial following juror deadlock under such circumstances, we fail to see how subjecting defendant to retrial of the penalty phase in this case could offend the constitutional proscription against cruel and unusual punishment." (*Taylor*, at p. 634; accord, *People v. Jackson, supra*, 1 Cal.5th at p. 356; *People v. Peoples* (2016) 62 Cal.4th 718, 751; *People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 311.)

In his reply brief, defendant acknowledges *Taylor* but urges us to reconsider that decision, arguing that by allowing "repeated attempts to convince a jury to return a death verdict," our retrial procedure impermissibly "enhances the possibility that even though the defendant's crime warrants a life sentence, he may be sentenced to death." As a matter of double jeopardy law, this argument fails because the government is entitled, in capital sentencing as in a trial of guilt, to one complete attempt to obtain the verdict sought, an opportunity not provided where a jury deadlock has resulted in a mistrial. (*Sattazahn v. Pennsylvania, supra*, 537 U.S. at p. 109; *id.* at pp. 120–121, 124 (dis. opn. of Ginsburg, J.).) Nor does defendant's cruel and unusual punishment claim persuade us to reconsider our decision in *Taylor*. As we explained in one of *Taylor*'s recent progeny, it is true that the prosecution benefits from retrial, but the same "may be said about any case that is retried after the jury deadlocks . . . . [T]he high court has recognized that ' "a defendant's valued right to have his trial completed by a particular tribunal must in some instances be subordinated to the public's interest in fair trials designed to end in just

judgments." ' " (*People v. Jackson*, *supra*, 1 Cal.5th at p. 356.) That a rule barring retrial of penalty on jury deadlock would benefit the defense does not demonstrate that the opposite rule, allowing retrial in order to provide the People a full opportunity to prove their case for the death penalty, deprives defendants of any right to which they are constitutionally entitled.

## XII. Denial of Funding for Mitochondrial DNA Testing

Defendant contends he was deprived of due process and the constitutional right to present a defense when, before the penalty retrial, the court denied investigative funds to conduct mitochondrial DNA testing on the pubic hairs recovered from the victim's clothing. He also argues the trial court erred in later precluding comment on the lack of such testing. We find no deprivation of constitutional rights in the denial of funding and no error in the court's later ruling.

In September 1998, after the first penalty trial ended in a hung jury, defense counsel (recently appointed to replace counsel at the first trial) requested that the judge presiding over investigative funding requests (Hon. Timothy J. Evans) under Penal Code section 987.9 authorize $3,500 to $4,500 for a laboratory in Virginia to conduct mitochondrial DNA (mtDNA) testing of the pubic hairs.[24] No DNA testing had yet been done on these hairs, which the prosecution evidence showed were

---

[24] At places in his briefing, defendant also appears to complain that mtDNA testing was denied for the blood stain on his shirt and for scrapings from under the victim's fingernails. His funding request as to those items, however, was for DNA-DQ ALPHA and PCR-DNA testing, respectively, rather than mtDNA testing. As the appellate briefing focuses exclusively on mtDNA, we discuss only the request for testing the pubic hairs.

physically similar to defendant's pubic hairs. Defendant asserted that the proposed mtDNA testing, which would take 12 to 14 weeks to complete and destroy half of the evidentiary material, was "critical" for the defense to oppose the prosecution identification of the hairs as defendant's.

At an October 1998 hearing before the trial judge (Hon. Loyd H. Mulkey, Jr.), defense counsel noted that Judge Evans had denied his funding requests for additional DNA testing, including for mtDNA testing on the pubic hairs. On February 1, 1999, after the new penalty jury was selected and sworn but before opening statements were made, counsel asked Judge Mulkey to take notice his funding requests for DNA analysis had been denied and renewed the request, together with a request for a continuance to conduct the testing; in the alternative, counsel sought permission to present evidence and argue to the jury that the funding requests had been denied. The prosecutor objected to any evidence that the People had not ordered mtDNA testing, asserting he had never even heard of that technique "before last Monday" and could find no authority for its use in California criminal proceedings.

On February 8, 1999, Judge Mulkey rejected the renewed funding request on the ground that, as the trial judge, he had no authority to entertain confidential requests under Penal Code section 987.9. The court then heard testimony from a defense DNA expert, Lisa Calandro. Neither she nor her laboratory performed mtDNA testing, but she testified generally as to how it worked, that it had been done elsewhere since before 1994, and that in her reading on the subject she had encountered no scientific controversy over its validity. Defendant also sought to call the director of the Virginia laboratory that would have

performed the mtDNA analysis to testify telephonically, but the court sustained the prosecutor's objection to that procedure under Evidence Code section 711. The court denied defendant's motion to allow evidence and argument on the fact there had been no mtDNA testing, but did so without prejudice to its renewal during trial.

During the penalty retrial, the court made a final ruling that it would not allow either party to present evidence or comment in argument on the other's failure to conduct mtDNA testing. "I don't know what a DNA test would produce because I don't have one. [¶] So I'm going to proscribe both sides from commenting in argument on [that or another unrelated matter]. That's going to have to be the ruling. If I'm wrong, I'm wrong. [¶] But I just, when I open it up, I just have to keep opening it up by stages." If the People were to comment on the fact that the defense did not conduct such testing when, before trial, they had custody of the samples, the defense would respond that they later sought funding for testing but were denied it. "Then why were they denied? What does Judge Evans tell me is the reason? [¶] The reason is not in the minute order. So perhaps I have to bring him down here and testify." The ruling applied to both evidence and argument.

Considering first the denial of funding for mtDNA testing of the pubic hairs, we conclude the trial court did not err. The September 1998 funding request failed to establish that mtDNA testing would likely produce admissible evidence. While California courts have since endorsed the admissibility of mtDNA evidence (e.g., *People v. Stevey* (2012) 209 Cal.App.4th 1400, 1414–1415), no published decision had done so at the time of trial. Although the record indicates that the trial court gave

defendant multiple opportunities to show that mtDNA testing was generally accepted in the scientific community, defendant did not make such a showing.[25] The request, moreover, failed to explain why the defense did not seek funding for mtDNA testing on the pubic hairs, which would take the laboratory some months to perform, before trial rather than between the mistrial and the penalty retrial when it bore the potential for delaying the retrial. For this reason as well, we cannot find an abuse of discretion in Judge Mulkey's declining to overrule Judge Evans's earlier ruling.

Nor has defendant established that the trial court's ruling on funding resulted in deprivation of his constitutional right to present a defense. Defendant cites several federal decisions for the proposition that denial of expert assistance may deprive a criminal defendant of due process and the right to present a defense. But in those cases, which arose on habeas corpus, the courts could consider information outside the appellate record and, if necessary, remand for an evidentiary hearing on factual questions about the nature and impact of potential extra-record evidence. (See *Wallace v. Stewart* (9th Cir. 1999) 184 F.3d 1112, 1116, 1118 [remanding for an evidentiary hearing on claim of ineffective assistance of counsel in failing to fully inform psychiatrists of the defendant's background]; *Dunn v. Roberts* (10th Cir. 1992) 963 F.2d 308, 313 [denial of expert on battered woman syndrome deprived the defendant of opportunity to

---

[25] Before this court defendant has cited cases from other jurisdictions that, starting in 1999, consistently allowed mtDNA evidence, but he did not cite any such cases before the trial court. The only evidence presented to the trial court was Calandro's testimony, which the court reasonably determined was insufficient to establish general acceptance.

present a defense where expert "would have aided Petitioner in her defense by supporting her assertion that she did not have the required specific intent"]; *Cowley v. Stricklin* (11th Cir. 1991) 929 F.2d 640, 643 [defendant "showed that psychiatric expertise would aid his defense significantly"]; cf. *Terry v. Rees* (6th Cir. 1993) 985 F.2d 283, 285 [denial of independent pathologist was harmless error where independent expert appointed in habeas corpus proceedings "agreed with the state pathologist that . . . the victim was subjected to repetitive child abuse with head injuries being the cause of death"].) Based on the record available on appeal, we cannot say the trial court deprived defendant of "a fair opportunity to present his defense" (*Ake v. Oklahoma* (1985) 470 U.S. 68, 76) or "the basic tools of an adequate defense" (*Britt v. North Carolina* (1971) 404 U.S. 226, 227) when it refused an untimely request for funding to conduct mtDNA testing, testing the defense failed to show would likely produce even admissible evidence.[26]

Nor did the court err in precluding evidence or argument on the failure of either party to conduct mtDNA testing. Each party posited a reason for its failure to do so: the prosecution that it had been unaware of the mtDNA technique and was unsure of its admissibility; the defense that the Penal Code section 987.9 judge had denied its funding request for such testing. The trial court saw no way of allowing evidence on the subject without also allowing exploration of these side issues.

---

[26]    Defendant asserts he would be entitled to testing under the standards set in Penal Code section 1405, which sets prerequisites and procedures for postconviction forensic DNA testing. We express no view on that question, which will arise if and when defendant makes a motion for postconviction testing.

Since there was no evidence as to what mtDNA testing would have found, the court concluded the fairest and most practicable approach was to omit any discussion of the topic. (See Evid. Code, § 352 [evidence may be excluded if its tendency to undue consumption of time and confusion of the issues outweighs it probative value].) In the absence of evidence as to why the parties did not perform mtDNA testing, jury arguments suggesting one or another inference from that omission would likely have been misleading and confusing. While jury arguments pointing to the absence of particular evidence generally qualify as "fair comment on the state of the evidence" (*People v. Medina* (1995) 11 Cal.4th 694, 756), the trial court retains the discretion to "ensure that argument does not stray unduly from the mark, or otherwise impede the fair and orderly conduct of the trial." (*Herring v. New York* (1975) 422 U.S. 853, 862.) We find no abuse of discretion in the trial court's ruling.

## XIII. Prosecutorial Misconduct in Argument on Penalty

Defendant contends the prosecutor made several improper remarks in argument to the jury that, taken together, deprived defendant of his due process right to a fair trial.

In *People v. Edelbacher* (1989) 47 Cal.3d 983, 1033, we held the prosecutor acted improperly in arguing that the capital defendant's family background, introduced as mitigation under Penal Code section 190.3, factor (k), gave him no reason to kill and therefore " 'is an aggravating factor.' " (See also *Edelbacher*, at p. 1041 (conc. opn. of Mosk, J.).) In his first assignment of misconduct, defendant maintains the prosecutors here[27]

---

[27] Prosecutor Nolan gave the first penalty argument, Prosecutor Schroeder the rebuttal.

committed *Edelbacher* error in arguing defendant had a "normal childhood" and had shown "no reason for him to turn into a rotten egg." We disagree. The prosecutors' argument was that the family background the defense had presented should be given no weight as mitigation: it was a "zero" on the scales. Prosecutors may properly point out the absence of mitigating evidence. (*People v. Wader* (1993) 5 Cal.4th 610, 659, fn. 9.) The defendant's argument, moreover, was forfeited by his failure to lodge an objection and seek a jury admonition. (*Id.* at p. 659.)

Second, defendant contends that in his rebuttal argument, Prosecutor Schroeder falsely told the jurors they could not consider lingering doubt because they had not heard the entirety of the prosecution's guilt-phase case. On two occasions the prosecutor did indeed make such an argument, but in both cases the court sustained defendant's objection and admonished the jury to disregard the argument.[28] At other points the prosecutor referred to witnesses who had testified at the guilt phase as

---

[28] On the first occasion, the prosecutor, complaining about "huge gaps" in the defense presentation of the facts, said: "Now for you to have a lingering doubt, you have to hear the entire case I put on last year." After the court sustained a defense objection and told the jury to "disregard that statement," the prosecutor immediately argued that defense counsel, in his opening statement, admitted "that he has to put on the entire case I put on—." Another objection was sustained but the court declined to admonish the jury again, saying, "I just did, counsel." Later in his argument, the prosecutor urged the jury to note the potential witnesses who had been mentioned but had not testified and asked rhetorically, "If you [didn't] hear my whole case, how can you have a lingering doubt?" Again an objection was sustained and the jury was admonished to "disregard the last sentence of the argument."

buttressing the case for guilt, prompting a defense objection and an admonishment by the court to "disregard that portion—that matter insofar as it references the guilt phase of the trial."

Despite the court's admonitions, defendant insists that the prosecutor's repeated suggestions that the penalty retrial jury was not in a position to consider lingering doubt because they had not heard the entire case for guilt, coupled with what he characterizes as a "terse" instruction on lingering doubt,[29] "failed to permit the jury to give full effect to the lingering doubt mitigation in this case."

We agree the prosecutor's repeated argument that the penalty retrial jury could not consider lingering doubt without having heard the entire prosecution case for guilt was a deceptive or reprehensible means of persuasion and hence constituted misconduct under California law. (*People v. Gonzales* (2011) 51 Cal.4th 894, 920; *People v. Hill, supra*, 17 Cal.4th at p. 819.) Even for a penalty retrial jury, lingering doubt is a proper consideration in mitigation. (*People v. Hamilton* (2009) 45 Cal.4th 863, 948–949; *People v. Gay* (2008) 42 Cal.4th 1195, 1218–1223.) Moreover, the jury instructions, including that on lingering doubt, were settled before argument to the jury. The prosecutor knew the court would instruct the jury it could consider that factor in mitigation, and should not have attempted to persuade the jury to the contrary. But in

---

[29] The jury was instructed: "Lingering doubt may be considered as a factor in mitigation if you have a lingering doubt as to the guilt of the defendant." The court refused the defense's more elaborate proposed instruction, which stated that "[t]he adjudication of guilt is not infallible" and permitted the jury to consider "the possibility that at some time in the future" new evidence might come to light.

light of the court's sustaining defense objections and promptly giving admonitions, a jury instruction that clearly (if concisely) allowed consideration of lingering doubt, and defense counsel's argument focusing on weaknesses in the evidence of guilt and expressly on lingering doubt as grounds for a verdict of life, we find no reasonable possibility the jury was confused on the subject and hence no such possibility it would have reached a different penalty verdict absent the misconduct. (See *Gonzales*, at p. 953.) Our conclusion necessarily implies the prosecutor's argument did not so infect the trial with unfairness as to deny defendant his federal due process rights. (*Id.* at p. 953, fn. 33.)

Third, defendant complains of a portion of the prosecutor's rebuttal argument addressing the time at which someone in a pickup truck had apparently abducted a boy—on the prosecution's theory, Michael Lyons—near the corner of Boyd and C Streets. The prosecutor argued that while the defense relied on Ray Clark's testimony that he saw the abduction at around 3:00 p.m. (too early for Michael to have reached that spot after leaving school or defendant after leaving the card room), the defense had failed to call Clark's cousin Charles Wilbur, who also witnessed the event and placed it later, at 3:30 or 4:00 p.m. Because the kidnapping charge had been dismissed after the guilt jury failed to reach a verdict on that count, defendant argues, it was unfair to hold against him that he "did not *again* raise a reasonable doubt about his guilt" of kidnapping.

The argument was proper. It responded directly to fairly extensive defense argument on the same points: the timing of the apparent abduction and the observations of Clark and Wilbur. The fact that the guilt jury did not unanimously find kidnapping proved beyond a reasonable doubt did not preclude

the prosecution from arguing, as a circumstance of the capital crime (Pen. Code, § 190.3, factor (a)), that defendant had in fact abducted the victim in town and taken him to the river bottoms. (See *People v. Jones* (2011) 51 Cal.4th 346, 378, fn. 6; *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1157.)  And as defendant acknowledges, "it is neither unusual nor improper to comment on the failure to call logical witnesses." (*People v. Gonzales* (2012) 54 Cal.4th 1234, 1275; see *People v. Zambrano* (2007) 41 Cal.4th 1082, 1174 [penalty phase].)

Fourth, defendant contends the prosecutor engaged in deceptive argument regarding the defense's ability to conduct DNA testing on the victim's fingernail scrapings.  In context, the prosecutor's argument was not prejudicial misconduct.

Before instruction and argument, the jury was read a stipulation about the fingernail scrapings:  " 'It's hereby stipulated to and agreed to by the parties that the fingernail scrapings taken from the body of Michael Lyons were appropriately transported to Forensic Analytical, DNA laboratory for the defense.  [¶]  The defense had the possession of the scrapings from January 19, 1998 until April 1998, after which time they were returned to the People.  [¶]  The defense did not test the fingernail scrapings.' "

In his argument to the jury, defense counsel stated that, as stipulated, defendant's "first lawyers" had the fingernail scrapings but had not tested them, that neither had the prosecution's experts, and that "I frankly don't know why no one examined it."  He went on to suggest the jury should hesitate to return a death sentence because in the future, improved DNA analysis techniques might be applied to the scrapings or to the

semen found on the victim's anal swab and might exonerate defendant.

In response, the prosecutor noted that defense counsel "makes a big deal about the fingernail scrapings, and he's the one who brought this whole idea up." Defense counsel, the prosecutor continued, had not asked the prosecution expert why she did not test the scrapings. Moreover, "Defense's own expert had it for almost three months. They didn't examine it either. Why didn't he present their expert to tell you why that wasn't done?" Defense counsel objected and, still before the jury, stated, "Your Honor, we went through this. I asked for money to get it done and it wasn't, and he is walking right into it." Outside the jury's presence, the court ruled it would allow the prosecutor to comment on the fact that—as stipulated—no defense expert had tested the scrapings, but not to ask rhetorically why defense counsel did or did not do anything. The same would apply to argument by defense counsel. In the jury's presence, the court admonished the jury to disregard both attorneys' remarks made before the recess and explained that the argument would be confined to the stipulation read them previously: "It's not to go beyond that."

Renewing his argument, the prosecutor stated that defense counsel is "the one who wants to prove lingering doubt" and that "[i]f there are unanswered questions with regard to the fingernail scrapings, that's where you look for the answer. He didn't provide it to you." The court sustained a defense objection to this remark and told the jury to disregard it. The prosecutor then stated, simply, "His expert had it for almost three months," and moved on to another topic.

We do not agree with defendant that the prosecutor spoke deceptively in asking rhetorically, "Why didn't he present their expert to tell you why that wasn't done?" That remark referred to the pretrial period in early 1998, described in the stipulation and in defense counsel's own prior jury argument, when defendant's "first lawyers" had the physical evidence and could have had their DNA expert examine the fingernail scrapings. Nothing we have found in the record indicates that at that time the defense failure to test was due to lack of funding; it was only later, in the period before the penalty retrial, that defendant's new attorneys sought and were denied funding for PCR-DNA testing on the fingernail scrapings. (See fn. 24, *ante*.)

The prosecutor did, though, violate the trial court's ruling by arguing, after the recess, that "[i]f there are unanswered questions with regard to the fingernail scrapings, that's [the defense] where you look for the answer. [Defense counsel] didn't provide it to you." The court had, immediately before this, ordered the attorneys to confine their arguments to the stipulated facts, meaning they could note the absence of testing but not assert that one or the other party was responsible for it. The prosecutor's improper argument, however, was not a very strong one, since the jury also knew that the prosecution had not tested the fingernail scrapings for DNA. In light of the sustained objection and prompt admonition, there is no reasonable possibility of prejudice. (*People v. Gonzales, supra*, 51 Cal.4th at p. 953.)

Fifth and finally, defendant claims the prosecutor endorsed improper experimentation by the jurors in urging them to look at a photograph of the victim's skin with a magnifying glass to see a pattern of knife marks. Use of a

magnifying glass to more closely examine an exhibit that has been admitted into evidence does not constitute improper experimentation, as it introduces no extra evidence material to the jury's deliberations. (*People v. Turner* (1971) 22 Cal.App.3d 174, 182.) The prosecutor's argument was therefore also not improper.

Although we have found two instances of improper prosecutorial argument (the argument that lingering doubt could not be considered and blaming the defense for the lack of DNA evidence regarding the fingernail scrapings), we have found neither bore a reasonable possibility of affecting the penalty verdict. We reach the same conclusion as to their cumulative effect: the two errors went to different topics of argument and the court gave the jury clear admonitions to disregard both remarks.

## XIV. Denial of Motion to Continue Sentencing

On September 10, 1999, the date set for sentencing, defendant moved for a continuance in order to prepare a motion for new guilt trial based on newly discovered evidence, namely a letter purporting to be from someone defense counsel referred to as "Raymond Walton" stating that defendant had been set up by a person named Timothy Clarke, who was confined in a Yolo County jail. In response, the prosecutor noted that the letter was actually signed simply "Raymond," purportedly of "Walton Ave." in Yuba City. The prosecution had called the telephone number given in the letter but found it disconnected. The woman who lived at the last address associated with that number had lived there for a year; she said no Raymond lived at the address. The letter was apparently sent to Al Rhoades, a relative of defendant, but Al had no idea who Raymond was.

Two men named Timothy Clark, spelled differently from the letter, had been confined in Yolo County jail, one in 1991 and one in 1997. The letter contained no information as to how Clark or Clarke had supposedly set defendant up for the crime. The prosecutor also noted that the guilt verdicts had been returned 15 months earlier and the intended new-trial motion would be defendant's third. The trial court, further noting the length of time that elapsed since the penalty verdicts had been returned in March 1999, found no cause for a continuance and denied the motion.

Continuances in criminal cases are to be granted only for good cause, and the trial court's denial of a continuance is reviewed for abuse of discretion only. (Pen. Code, § 1050, subd. (c); *People v. Jenkins*, *supra*, 22 Cal.4th at p. 1037.) Given the length of time elapsed since the guilt and penalty verdicts and the vague and speculative nature of the letter's claim, there was no abuse of discretion here.

## XV. Conviction on Multiple Offenses Arising from the Same Act

On counts four through seven—torture, forcible sodomy on a child, lewd act on a child, and forcible lewd act on a child—the sentencing court imposed prison sentences but ordered them stayed under Penal Code section 654 pending execution of the sentence for murder. Defendant contends the stay of sentence was insufficient to protect him, arguing it is "unfair and unconstitutional under the Fifth and Eighth Amendments to permit a jury in a death penalty case to use the same identical facts to convict appellant of separate crimes, which they then are permitted to consider in deciding whether he should live or die." We rejected similar arguments in *People v. Melton* (1988)

44 Cal.3d 713, 766–768 (holding consideration of overlapping special circumstances proper but providing that jury should be told, on defense request, not to double count each special circumstance), and *People v. Richardson* (2008) 43 Cal.4th 959, 1029 (explaining that "lewd conduct is a separate offense from either rape or sodomy and therefore the jury could consider all three special circumstances under section 190.3, factor (a)"). The jury here was instructed not to double count the special circumstance findings even though they were also circumstances of the capital crime: "[Y]ou may not weigh the special circumstances more tha[n] once in your sentencing determination." Defendant cites nothing in the record to suggest, and we have seen no indication, that the jury nonetheless gave any improper weight to the circumstance that defendant had, during his fatal attack on Michael Lyons, committed multiple sexual offenses as well as torture.

## XVI. Refusal of Defense Instructions on Determination of Penalty

Defendant complains of the court's refusal to give several of his proposed special instructions. We find no error.

First, defendant offered an instruction stating that the mitigating circumstances listed "are given merely as examples" and the jury should not limit consideration to these specific factors but may consider "mercy, sympathy and/or sentiment in deciding what weight to give each mitigating factor." The trial court refused the instruction on the ground it was adequately covered by CALJIC No. 8.88, which as given here defined a mitigating circumstance as "any fact, condition or event which does not constitute a justification or excuse for the crime in question, but may be considered as an extenuating

circumstance" in determining the penalty. The jury was also instructed in CALJIC No. 8.85 that under Penal Code section 190.3, factor (k), they could consider in mitigation "any sympathetic or other aspect of the defendant's character or record . . . whether or not related to the offense for which he is on trial."

We have held that these standard instructions "leave adequate room for the consideration of mercy" without an instruction using that term (*People v. Thomas* (2012) 53 Cal.4th 771, 827) and that an express reference to "mercy" risks encouraging arbitrary decisionmaking (*People v. Lewis* (2001) 26 Cal.4th 334, 393)—a risk aggravated here by defendant's proposed instruction's use of the term "sentiment." Defendant provides no compelling argument to reexamine these conclusions.

Second, defendant's proposed instruction stating that "the evidence which has been presented regarding the defendant's background may only be considered by you as mitigating evidence" was also refused as cumulative of standard instructions. Defendant contends it was error to refuse this instruction, and the prosecutor exploited the error by arguing defendant's background as an aggravating circumstance. (But see pt. XIII., *ante* [rejecting this characterization of the prosecutor's argument].) We have held that "[t]he court need not instruct that the jury can consider certain statutory factors only in mitigation" (*People v. Valencia* (2008) 43 Cal.4th 268, 311) and that "[i]t follows the trial court need not instruct that background evidence may be considered only in mitigation" (*People v. Rogers* (2006) 39 Cal.4th 826, 897; see also *Tuilaepa v. California* (1994) 512 U.S. 967, 979 ["A capital sentencer need

not be instructed how to weigh any particular fact in the capital sentencing decision."]).  We adhere to these holdings.

Third, defendant asked that the jury be instructed:  "If you sentence the defendant to death, you must assume that the sentence will be carried out."  The trial court declined to give that instruction "in the abstract, so to speak" but agreed that an instruction on the topic would be appropriate "if there is a reason to believe the jury has concerns or misunderstanding" regarding the effect of a death verdict.  This course accorded with our precedent (*People v. Wallace* (2008) 44 Cal.4th 1032, 1091; *People v. Kipp* (1998) 18 Cal.4th 349, 378–379) and was not error.  The jury did not indicate on the record any confusion or doubt as to the meaning or effect of either of the possible penalty verdicts.

Finally, the trial court refused defendant's request that the jury be instructed:  "A jury may decide, even in the absence of mitigating evidence, that the aggravating evidence is not comparatively substantial enough to warrant death."  But where, as here, the jury is instructed that "[t]o return a judgment of death each of you must be persuaded that the aggravating evidence is so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole," an instruction like the one defendant proposed is unnecessary to guide the jury.  (*People v. Rodrigues, supra*, 8 Cal.4th at p. 1191, italics omitted.)

## XVII.  Cumulative Prejudice from Errors

The only errors we have found in the penalty phase are two instances of prosecutorial misconduct in argument to the jury.  As discussed above (see pt. XIII., *ante*), they were not prejudicial either individually or cumulatively.

## XVIII.  Delay in Appellate Review

Defendant contends that executing him after significant passage of time during the appellate process would constitute cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution.  We have rejected this claim in numerous decisions beginning with *People v. Anderson* (2001) 25 Cal.4th 543, 606:  "As we have explained, the automatic appeal process following judgments of death is a constitutional safeguard, not a constitutional defect [citations], because it assures careful review of the defendant's conviction and sentence [citation].  Moreover, an argument that one under judgment of death suffers cruel and unusual punishment by the inherent delays in resolving his appeal is untenable.  If the appeal results in reversal of the death judgment, he has suffered no conceivable prejudice, while if the judgment is affirmed, the delay has prolonged his life."  (See also *People v. Seumanu* (2015) 61 Cal.4th 1293, 1368–1369 [following *Anderson* and reciting intervening precedent in accord].)

More recently, we considered at length and rejected the related claim that systematic delays in implementation of California's death penalty render the penalty impermissibly arbitrary in violation of the Eighth Amendment.  (*People v. Seumanu, supra*, 61 Cal.4th at pp. 1371–1375; accord, *People v. Clark* (2016) 63 Cal.4th 522, 645; see also *Jones v. Davis* (9th Cir. 2015) 806 F.3d 538, 546–553 [theory of arbitrariness by delay proposes new rule of constitutional law that cannot be applied to state procedures in federal habeas corpus case].)

Defendant's briefing provides no grounds for reexamining either of these conclusions.

### XIX.  Incomplete Appellate Record

Defendant contends his conviction must be reversed because the parties were unable to reconstruct via a settled statement four unreported bench conferences and several "off-the-record" discussions concerning record correction, and because certain confidential attorney fee requests could not be obtained either from the Sutter County Superior Court or from trial counsel.  He argues generally that without these transcripts he cannot make an argument about "any reversible error that may have occurred" and that the attorney fee requests, in particular, "could bolster a claim of ineffective assistance of counsel."  " '[D]efendant bears the burden of demonstrating that the appellate record is not adequate to permit meaningful appellate review.  [Citations.]  He has not done so.' " (*People v. Richardson* (2008) 43 Cal.4th 959, 1037.)

### XX.  Relief from Defaults and Incorporation of Claims

In a set of generalized arguments that do not refer to any of his brief's specific claims for relief, defendant maintains that all violations of state law rights also constitute federal constitutional violations, that trial counsel's failure to request or object to instructions should be excused, that we should review all errors in capital cases on the merits rather than invoking procedural bars, and that when the court reviews defendant's to-be-filed petition for writ of habeas corpus we consider any claim that should have been raised on appeal to be incorporated into his appellate briefing.

We have addressed questions of forfeiture as necessary in discussion of defendant's specific arguments for reversal and have addressed the merits of defendant's constitutional claims

whenever appropriate. With regard to claims made on habeas corpus, defendant has not yet filed a petition challenging his convictions and death sentence, but in any event we would decline to incorporate habeas corpus claims into the appellate brief in the manner requested. (See *People v. Richardson*, *supra*, 43 Cal.4th at p. 1038.)

## XXI. Constitutionality of California's Death Penalty

Defendant raises a number of federal constitutional challenges to California's death penalty law, each of which we have previously rejected.

"[T]he California death penalty statute is not impermissibly broad, whether considered on its face or as interpreted by this court." (*People v. Dykes* (2009) 46 Cal.4th 731, 813.) Penal Code section 190.3, factor (a), which permits a jury to consider the circumstances of the offense in sentencing, does not result in arbitrary or capricious imposition of the death penalty in violation of the Fifth, Sixth, Eighth, or Fourteenth Amendments to the United States Constitution. (*People v. Simon* (2016) 1 Cal.5th 98, 149; see *Tuilaepa v. California*, *supra*, 512 U.S. at pp. 975–976, 978.)

"The death penalty statute does not lack safeguards to avoid arbitrary and capricious sentencing, deprive defendant of the right to a jury trial, or constitute cruel and unusual punishment on the ground that it does not require either unanimity as to the truth of aggravating circumstances or findings beyond a reasonable doubt that an aggravating circumstance (other than Pen. Code, § 190.3, factor (b) or (c) evidence) has been proved, that the aggravating factors outweighed the mitigating factors, or that death is the appropriate sentence." (*People v. Rangel*, *supra*, 62 Cal.4th at

p. 1235.)   The Supreme Court's recent Sixth Amendment decisions (e.g., *Hurst v. Florida* (2016) 577 U.S. ___ [136 S.Ct. 616], *Ring v. Arizona* (2002) 536 U.S. 584, and *Apprendi v. New Jersey* (2000) 530 U.S. 466) do not affect our conclusions in this regard.  (*Rangel*, at p. 1235.)

"The jury may properly consider evidence of unadjudicated criminal activity under section 190.3, factor (b) [citation], jury unanimity regarding such conduct is not required [citation], and factor (b) is not unconstitutionally vague.   (*Tuilaepa v. California, supra*, 512 U.S. at p. 976.)"  (*People v. Lee* (2011) 51 Cal.4th 620, 653.)  Nor does our statute's lack of a requirement for written jury findings on aggravating circumstances violate due process or the Eighth Amendment or deny a capital defendant the opportunity for meaningful appellate review. (*People v. Winbush, supra*, 2 Cal.5th at p. 490; *People v. Whalen* (2013) 56 Cal.4th 1, 91.)  And, as discussed earlier (see pt. XVI, *ante*), an instruction that certain factors may only be considered in mitigation is not constitutionally required. (*Tuilaepa*, at p. 979; *People v. Valencia, supra*, 43 Cal.4th at p. 311.)

"Intercase proportionality review, comparing defendant's case to other murder cases to assess relative culpability, is not required by the due process, equal protection, fair trial, or cruel and unusual punishment clauses of the federal Constitution." (*People v. Winbush, supra*, 2 Cal.5th at p. 490.)  Procedural differences between capital and noncapital trials do not constitute violations of equal protection, and California's use of the death penalty does not violate international law either by punishing certain first degree murders with death or by employing the procedures defendant complains of above.

(*People v. Sánchez* (2016) 63 Cal.4th 411, 488; *People v. Solomon* (2010) 49 Cal.4th 792, 844.)

## DISPOSITION

The judgment of the superior court is affirmed.

**KRUGER, J.**

**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**CHIN, J.**
**CORRIGAN, J.**
**CUÉLLAR, J.**
**GROBAN, J.**

PEOPLE v. RHOADES

S082101


Dissenting Opinion by Justice Liu


During jury selection for the penalty retrial in this capital case, defendant Robert Boyd Rhoades raised a challenge under *Batson v. Kentucky* (1986) 476 U.S. 79 and *People v. Wheeler* (1978) 22 Cal.3d 258 after prosecutors used four of eight peremptory strikes against four black women jurors, thereby "eliminat[ing] every African-American seated in the jury box." (Maj. opn., *ante*, at p. 52.) The proceeding occurred in 1998, seven years before *Johnson v. California* (2005) 545 U.S. 162, and the trial court believed it was bound by this court's precedent, *People v. Howard* (1992) 1 Cal.4th 1132, 1154 (*Howard*), which required a defendant to show not merely an inference but a " '*strong likelihood*' " of discrimination at *Batson*'s first step. Applying that standard, the trial court denied the *Batson* motion but said, "I'm very close."

These facts bear an uncanny resemblance to those in *Johnson v. California*, where the trial court also denied a *Batson* motion under the "strong likelihood" standard but said, "[W]e are very close." (*Johnson v. California, supra*, 545 U.S. at p. 165, italics omitted; see *id.* at p. 164 [prosecutor used three of 12 strikes to remove all three black jurors].) In that case, the high court disapproved the "strong likelihood" standard, calling it "an inappropriate yardstick by which to measure the sufficiency of a prima facie case." (*Id.* at p. 168.) "Instead," the high court held, "a defendant satisfies the requirements of *Batson*'s first step by producing evidence sufficient to permit the

1

trial judge to draw an inference that discrimination has occurred." (*Id.* at p. 170.) Then, in concluding that the defendant had met this burden, the high court explained: "In this case the inference of discrimination was sufficient to invoke a comment by the trial judge 'that "we are very close," ' and on review, the California Supreme Court acknowledged that 'it certainly looks suspicious that all three African-American prospective jurors were removed from the jury.' [Citation.] *Those inferences that discrimination may have occurred were sufficient to establish a prima facie case under* Batson." (*Id.* at p. 173, italics added.)

If the evidence of discrimination is "very close" to meeting the "strong likelihood" standard, then logically it is sufficient to meet the less onerous "inference" standard. Yet today's opinion, sidestepping *Johnson v. California*'s logic, finds no inference of discrimination at *Batson*'s first step. How is this possible? "[M]ost importantly," the court says, "the record discloses readily apparent grounds for excusing each prospective juror, dispelling any inference of bias that might arise from the pattern of strikes alone." (Maj. opn., *ante*, at p. 65.)

As I discuss below, this mode of analysis — hypothesizing reasons for the removal of minority jurors as a basis for obviating inquiry into the prosecutor's actual reasons — has become a staple of our *Batson* jurisprudence, and it raises serious concerns. "The *Batson* framework is designed to produce actual answers" — not hypothesized answers — "to suspicions and inferences that discrimination may have infected the jury selection process." (*Johnson v. California, supra*, 545 U.S. at p. 172.) If an inference of bias is to be dispelled, it is up to the prosecutor to dispel it by stating credible, race-neutral reasons

for the strikes. It is not the proper role of courts to posit reasons that the prosecutor might or might not have had. This case illustrates the problem: By combing the record for "readily apparent" reasons for the strikes (which, on close inspection, are not readily apparent at all), the court does exactly what *Johnson v. California* "counsels against": It "engag[es] in needless and imperfect speculation when a direct answer can be obtained by asking a simple question." (*Ibid.*)

The court's opinion coincides with a decision, also filed today, finding no inference of discrimination where the prosecutor disproportionately excused black jurors in the penalty trial of a black defendant accused of killing a white man and raping a white woman. (*People v. Johnson* (Nov. 25, 2019, S029551) __ Cal.5th __, __ [p. 41].) The prosecutor there was asked but declined to answer whether he targeted black prospective jurors for criminal background checks. (*Id.* at p. __ [p. 35].) Of course, each case must be evaluated on its own facts. But if we consider today's decisions together and alongside others in our case law, some unsettling observations emerge.

It has been more than 30 years since this court has found *Batson* error involving the peremptory strike of a black juror. (See *People v. Snow* (1987) 44 Cal.3d 216.) In the 14 years since *Johnson v. California*, this court has reviewed the merits of a first-stage *Batson* denial in 42 cases, all death penalty appeals. (See appen., *post*, at p. 25.) Not once did this court find a prima facie case of discrimination — even though all 42 cases were tried before *Johnson v. California* disapproved the "strong likelihood" standard and held that "an inference of discrimination" is enough. In light of this remarkable uniformity of results, I am concerned that "this court has

improperly elevated the standard for establishing a prima facie case beyond the showing that the high court has deemed sufficient to trigger a prosecutor's obligation to state the actual reasons for the strike." *(People v. Harris* (2013) 57 Cal.4th 804, 864 (conc. opn. of Liu, J.) (*Harris*).) Today's decisions are the latest steps on what has been a one-way road, and I submit it is past time for a course correction.

## I.

The penalty retrial in this case began in 1998 in Sacramento County, a community that was 64 percent white and 10 percent black at the time. (U.S. Census Bureau, 2000 Census of Population and Housing, Summary Population and Housing Characteristics: California (2002) p. 112.) Rhoades, a white man, was convicted of killing a white eight-year-old boy. Defense counsel made his first *Batson* motion after the prosecution used three of five peremptory strikes to remove three black women: Shirley R., Adrienne A., and Alice S. The trial court denied the motion, and the prosecution declined the court's invitation to state reasons for the record. The prosecution later excused a fourth black woman, Alicia R., leaving no black jurors on the panel. At that point, the prosecution had used four of eight strikes against black women, and defense counsel made a second *Batson* motion. Three additional jurors were subsequently seated on the main panel.

After the second *Batson* motion, the prosecution gave the trial court a copy of *Howard, supra*, 1 Cal.4th 1132, which held that the "strong likelihood" standard applied at *Batson*'s first step. Defense counsel argued that he needed to show only "that the relevant circumstances raise an inference that the government use [sic] the challenges to exclude a class of jurors

because of their race." Defense counsel observed that none of the struck jurors had been challenged for cause for their death penalty views and that there were "no discernable differences" between the struck jurors and those remaining in the jury box, citing "Relatives in prison," "Formerly victims of assault," "Strong religious views," and "Volunteers somehow related to WEAVE" as similarities. One prosecutor said, "Oh, I think there are significant differences," but declined to elaborate when asked to do so because the trial court had not yet found a prima facie case.

The prosecutor again insisted that "a strong likelihood" was required and that defense counsel's showing did not "rise to the level to [sic] the standards set out in *People v. Howard* or *People v. Wheeler*." The trial court compared the prosecution's strikes with the pattern of strikes in *Howard* and said, "The distinction that's bothering me in the case that you cite . . . you have essentially two out of eleven [in *Howard*] . . . [a]nd in this case, you had four out of eight? That's quite a distinction, isn't it?" The prosecutor maintained that more was required under *Howard*, and defense counsel reiterated that there were "no discernable differences" between the struck jurors and other jurors. The trial court again invited the prosecutor to describe how the jurors were different; the prosecution again declined.

The trial court denied the *Batson* motion under "the authority of this *Howard* case" but warned that "any further matters of this kind will weigh heavily on this Court . . . . I've indicated how the Court feels at this juncture. I'm very close, I'm going to go with *Howard* for the time being, but if I see very much more of this, I'm going to indicate to you, you may well have a serious problem on your hands."

5

These circumstances readily support an inference of discrimination. At the time of the second *Batson* motion, the prosecutors had accepted no black jurors; instead, they had removed all the black jurors they could have removed up to that point. And there is no indication that the prosecutors later accepted a black juror. Further, as today's opinion concedes, "the prosecutors' use of half their strikes against the four African-American prospective jurors was substantially disproportionate to the representation of African-Americans in the jury pool" given the demographic makeup of the community. (Maj. opn., *ante*, at p. 52.) The record makes clear that the pattern of strikes caught the attention of the trial court as well.

It is true that this case does not involve " ' "[r]acial identity between the defendant and the excused person." ' " (Maj. opn., *ante*, at p. 53.) But assuming the jury's racial composition approximated the demographics of the community, it is likely that this case involved " ' "[r]acial identity . . . between the victim and the majority of remaining jurors." ' " (*Ibid.*) In capital cases involving white victims, it is entirely plausible that prosecutors may be motivated to seat white jurors. And whether a prosecutor strikes a black juror in order to seat fewer black jurors or to seat more white jurors, it is discrimination all the same.

What the record also makes clear is that the trial court believed it was bound by *Howard*'s "strong likelihood" standard and had that standard clearly in mind when it denied the *Batson* motion and said, "I'm very close." Before the trial court ruled, the parties had argued over the proper standard, and "the trial court presumably understood the [*Howard*] standard to be somewhat more demanding than the 'reasonable inference'

standard, for which defendant had argued." (Maj. opn., *ante*, at p. 50.) The trial court ultimately decided "to go with *Howard* for the time being" instead of defense counsel's position that it was enough to show "that the relevant circumstances raise an inference" of discrimination.

Given this context, the most natural meaning of the comment "I'm very close" is that the trial court found the circumstances sufficient to raise "an inference" of discrimination but not quite a "strong likelihood" of discrimination. Indeed, I am not sure what else it could mean. Consider an analogy: If a judge analyzing a set of facts under the clear and convincing evidence standard were to say, "I'm very close," wouldn't we conclude that the judge has determined that the facts meet the preponderance of the evidence standard?

As noted, *Johnson v. California* involved a virtually identical comment by a trial court applying the " 'strong likelihood' " standard. (*Johnson v. California*, *supra*, 545 U.S. at p. 165, italics omitted.) In analyzing the *Batson* issue under the correct standard, the high court said: "In this case the inference of discrimination was sufficient to invoke a comment by the trial judge 'that "we are very close," ' and on review, the California Supreme Court acknowledged that 'it certainly looks suspicious that all three African-American prospective jurors were removed from the jury.' *Those inferences that discrimination may have occurred were sufficient to establish a prima facie case under* Batson." (*Id.* at p. 173, italics added.)

Today's opinion attempts to distinguish *Johnson v. California* by noting that it involved the racially charged context of a black defendant accused of killing his white girlfriend's child. (Maj. opn., *ante*, at p. 62.) But in comparing this case to

*Johnson v. California*, the court neglects to mention that this case involves the strikes of four black jurors, not three, and the percentage of prosecution strikes used against black jurors was one-half (four out of eight), not one-fourth (three out of 12). (See *Johnson v. California*, 545 U.S. at p. 164.) Because there are countless varieties of circumstances where a trial court could find that multiple strikes of black jurors come "very close" to a "strong likelihood" of discrimination, I do not see how the differences between this case and *Johnson v. California* diminish the salience of the trial court's comment here.

Today's opinion goes on to resist the clear meaning of "I'm very close" by saying, "The trial court's statement appears to have been intended as a warning to the prosecutors to be careful with their future peremptories, because additional strikes might lead to a finding of a prima facie case of discrimination." (Maj. opn., *ante*, at p. 64.) But the trial court's warning that "additional strikes might lead to a finding of a prima facie case" *under the erroneously high standard* suggests that in its view the lower and correct standard had already been satisfied or surpassed. Today's opinion then says, "It is not clear the trial court meant it as a commentary on how suspicious (or not) the prior strikes had been, given the totality of the circumstances." (*Id.* at pp. 64–65) *But what else could the trial court have meant?* Next, today's opinion says, "nor is it apparent that the court implied the existence of a prima facie case under a 'reasonable inference' standard." (*Ibid.*) But the same thing could have been said of the trial court in *Johnson v. California*, and yet the natural meaning of its "very close" comment was readily discerned and credited by the high court. (See *Johnson v. California, supra*, 545 U.S. at p. 173.)

Today's opinion further says, "In any event, our review of the court's ruling in this case is independent," thereby attempting to distance our analysis from the trial court's. (Maj. opn., *ante*, at p. 65.) But the reason we apply independent review is that "the court may have used a standard for the prima face case that was later found too demanding under *Batson*." (*People v. Bell* (2007) 40 Cal.4th 582, 598.) Our need to independently determine whether the correct legal standard has been satisfied does not negate the relevance of the trial court's underlying assessment of how suspicious these four strikes were. In light of all that this court and the high court have said about the firsthand perspective of trial courts in the *Batson* inquiry (see, e.g., *People v. Lenix* (2008) 44 Cal.4th 602, 626–627; *Snyder v. Louisiana* (2008) 552 U.S. 472, 477), I see no reason why we would or could ignore the trial court's comment here. Having watched the jurors answer questions, and having observed the prosecutors conduct voir dire, use peremptory strikes, and argue the *Batson* issue, the trial court determined that the circumstances were "very close" to establishing a "strong likelihood" of discrimination. Even if this determination is not binding on us, it is entitled to substantial weight in our analysis — just as the trial court's identical observation in *Johnson v. California* was given substantial weight by the high court.

## II.

The analysis should end there, as it did in *Johnson v. California*, with the straightforward conclusion that the trial court's "inference[] that discrimination may have occurred [was] sufficient to establish a prima facie case under *Batson*." (*Johnson v. California, supra*, 545 U.S. at p. 173.) Yet today's

9

opinion manages to salvage the trial court's ruling. How? By resorting to a mode of reasoning that nowhere appears in the high court's *Batson* doctrine: Any inference of discrimination is dispelled, this court says, because "the record discloses readily apparent, race-neutral grounds for a prosecutor to use peremptory challenges against each of the four prospective jurors at issue." (Maj. opn., *ante*, at p. 53.)

We will examine those "readily apparent" grounds in a moment, but let us first pause to consider what the court has done here. Step one of the *Batson* framework is a threshold inquiry to determine whether the prosecutor should be required to state reasons for contested strikes. In many instances, the prosecutor will voluntarily state reasons before the first-step determination is made, in order to remove any doubt about the issue. In this case, the prosecutors chose to stay mum; they repeatedly declined to explain why they believed the struck jurors differed from seated jurors. Now, instead of taking their silence at face value, this court on appellate review claims it is able to discern the reasons that would have motivated any reasonable prosecutor to strike the four black jurors. The court then relies on those *hypothesized* reasons to conclude that there was no need for the prosecutors to state their *actual* reasons.

This maneuver is hard to square with the high court's clear statement that "[t]he *Batson* framework is designed to produce actual answers to suspicions and inferences that discrimination may have infected the jury selection process." (*Johnson v. California, supra,* 545 U.S. at p. 172; see *ibid.* [" '[I]t does not matter that the prosecutor might have had good reasons . . . [;] [w]hat matters is the real reason they were stricken' "].) No wonder the high court has never approved the

consideration of hypothesized reasons in first-stage *Batson* analysis. (Cf. *Williams v. Louisiana* (2016) 579 U.S. __, __ [136 S.Ct. 2156, 2156] (conc. opn. of Ginsburg, J., joined by Breyer, Sotomayor & Kagan, JJ.) [state rule permitting the trial court instead of the prosecutor to supply a race-neutral reason at *Batson*'s second step "does not comply with this Court's *Batson* jurisprudence"].)

Again, the high court's application of the law to the facts in *Johnson v. California* is instructive. There, the trial judge's "own examination of the record had convinced her that the prosecutor's strikes could be justified by race-neutral reasons. Specifically, the judge opined that [two of] the black venire members had offered equivocal or confused answers in their written questionnaires." (*Johnson v. California, supra*, 545 U.S. at p. 165.) On review, this court hypothesized various reasons to explain the strike of the third black juror. (See *People v. Johnson* (2003) 30 Cal.4th 1302, 1325–1326 ["[T]he record discloses race-neutral grounds for challenging C.T.: "(1) she was childless (this case involved the death and alleged abuse of a minor), (2) the police had made no arrest after the robbery of her home five or six years ago, and (3) she omitted to answer the two questions in the questionnaire dealing with her opinions of prosecuting and defending attorneys."].) But the high court assigned no weight to any of these hypothesized reasons in considering whether a prima facie case of discrimination had been established. (*Johnson v. California*, at p. 173.)

Today's opinion gives a nod to *Johnson v. California*'s admonition " 'against engaging in needless and imperfect speculation' " (maj. opn., *ante*, at p. 54) but denies that any imperfect speculation is happening here. The court says

11

hypothesized reasons must be limited to " 'obvious' " or "readily apparent" race-neutral characteristics "that any reasonable prosecutor trying the case would logically avoid in a juror." (*Id.* at pp. 53–54, italics omitted.) As this case illustrates, however, what is "obvious" or "readily apparent" is an elastic concept, especially in the hands of appellate judges who "have the benefit of being able to examine the record in more detail, and at a great deal more leisure, than a [prosecutor] in the midst of jury selection." (*Id.* at p. 55, fn. 16.)

Consider Alice S., one of the black jurors struck. In her questionnaire and during voir dire, she discussed her brother's conviction and incarceration in Virginia and her belief that he had been convicted only because his alcoholism and homelessness meant that he could not account for his activities at the time of the crime. Today's opinion says that "[f]rom any reasonable prosecutor's perspective, this belief created a clear risk that Alice S. might be especially receptive to the alibi defense put forward by defendant, who claimed to be taking drugs during the period when the victim was abducted and killed." (Maj. opn., *ante*, at p. 59, fn. 19.) But this explanation is far from obvious in light of the stark dissimilarities between Rhoades's case and the situation of Alice S.'s brother.

Alice S. testified that the convergence of two factors — her brother's alcoholism and his homelessness — prevented him from mounting an alibi defense: "[H]e didn't really have anywhere to live. So he basically was out in the streets. And because he had no accountability as far as, you know, being impaired, you know, I felt like he is an alcoholic but he wasn't a molester or whatever." Rhoades, by contrast, lived in a home in Sutter County at the time of the crime; he was employed and

owned a truck. In describing his drug use, Rhoades described himself as a "weekender": "I work all week long and do my partying on the weekends." The prosecution's evidence revealed the relatively privileged nature of Rhoades's life and upbringing, including his education in private schools and a father who employed him despite his substance abuse. It is hardly obvious that Alice S.'s sympathy for her brother's inability to mount an alibi defense would have made her "especially receptive" to the alibi defense put forward by Rhoades, whose personal and social circumstances differed greatly from her brother's. Indeed, Alice S. said, "I think [defendants] should be held responsible if there was alcohol and drugs and they're convicted," and she unequivocally accepted the fact that Rhoades had been convicted of first-degree murder with special circumstances. The prosecution did not press her on this point.

Moreover, it is not obvious that the prosecution would have been much concerned about lingering doubt in light of the strong physical evidence linking Rhoades to the murder, including blood on Rhoades's clothing, pubic hairs consistent with Rhoades's found on the victim's clothing, the victim's footprints on the inside of the windshield of Rhoades's truck, and a DNA test showing the victim's blood on Rhoades's knife — all of which the prosecutors intended to present, and did present, in detail during the two-month penalty retrial. (Maj. opn., *ante*, at pp. 6–7, 58; see *id.* at p. 19 [finding confrontation clause error harmless "beyond a reasonable doubt" given the strength of the evidence].) Although the defense did rely on lingering doubt in mitigation, the prosecution was aware from the first penalty trial that the defense would not cite Rhoades's drug use to bolster the case for lingering doubt (and indeed, the defense did not do so).

Today's opinion also posits that the prosecutors struck Alice S. because she was unsure she would be able to serve as a juror while caring for her six-month-old infant. But Alice S. did not request a hardship excusal, even though the trial court granted hardship excusals for other jurors who had family obligations. And during voir dire, the prosecution did not ask Alice S. a single question about whether her childcare duties would interfere with serving on the jury. Even if it is possible that this concern motivated the prosecution to remove Alice S., is it so obvious that we need not inquire?

As for Shirley R., Adrienne A., and Alicia R., today's opinion hypothesizes that they were struck because of their anti-death penalty views. Here it is important to keep in mind that the prosecution, before exercising peremptory strikes, can use a for-cause challenge to remove a prospective juror whose death penalty views would " 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " (*Wainwright v. Witt* (1985) 469 U.S. 412, 424, fn. omitted.) "Substantial impairment" does not require the juror to have expressed firm opposition to the death penalty. "In many cases, a prospective juror's responses to questions on voir dire will be halting, equivocal, or even conflicting. Given the juror's probable unfamiliarity with the complexity of the law, coupled with the stress and anxiety of being a prospective juror in a capital case, such equivocation should be expected." (*People v. Fudge* (1994) 7 Cal.4th 1075, 1094). We regularly affirm trial court findings of substantial impairment " 'even in the absence of clear statements from the juror that he or she is impaired because "many veniremen simply cannot be asked enough questions to reach the point where their bias has been made 'unmistakably clear.' " ' "

14

(*People v. Jones* (2012) 54 Cal.4th 1, 41; see, e.g., *People v. Hawthorne* (2009) 46 Cal.4th 67, 83 (*Hawthorne*) [upholding for-cause excusal where juror gave "equivocal answers" and "was 'less than consistent in her answers' "]; *People v. Merriman* (2014) 60 Cal.4th 1, 52 [same]; *People v. Williams* (2013) 56 Cal.4th 630, 665–666 [same]; *People v. Solomon* (2010) 49 Cal.4th 792, 832 [same].)

In this case, the prosecution did not challenge Shirley R., Adrienne A., or Alicia R. for cause. This fact underscores that it is "judicial speculation" (*Johnson v. California*, *supra*, 545 U.S. at p. 173) to hypothesize that the prosecution struck these jurors for their death penalty views. Quoting selectively from the juror questionnaires and voir dire, the court says no seated juror expressed "the sort of unqualified opposition to the death penalty that both Shirley R. and Adrienne A. did *at times*. Two non-African-American prospective jurors who did express such unqualified antideath penalty views on their questionnaires were struck by the prosecution before defendant made his second [] motion." (Maj. opn., *ante*, at pp. 57–58, italics added.) Not only were the views of these two nonblack jurors, Evelyn B. and Thomas S. (both white), markedly more skeptical of the death penalty, but the prosecution challenged both of them for cause, though unsuccessfully. How can we conclude that Shirley R.'s and Adrienne A.'s death penalty views were "readily apparent" grounds for striking them when the prosecution did not even attempt to excuse them for cause? Especially when a juror's equivocal views may result in excusal for cause? To be sure, their death penalty views could have been a legitimate concern to a reasonable prosecutor. But that is a far cry from saying these black jurors had views that "any reasonable prosecutor . . . would logically avoid." (Maj. opn., *ante*, at p. 54.)

15

I acknowledge there can be instances where a juror's death penalty views do not amount to substantial impairment but do present an obvious concern to the prosecution. (Maj. opn., *ante*, at p. 61.) But this is not one. When the death penalty views of each struck juror are considered not selectively but in their totality (maj. opn., *ante*, at pp. 55–61), it is evident that each juror simply gave the type of " 'equivocal or confused answers' " we often see in capital jury selection — the type of answers that the high court found unilluminating and irrelevant in *Johnson v. California*. (*Johnson v. California, supra*, 545 U.S. at p. 165; but cf. maj. opn., *ante*, at pp. 63–64, fn. 21.)

Indeed, at least six seated jurors also expressed hesitation or inconsistency in their death penalty views. Juror No. 4 said she "[didn't] really have an opinion" about the death penalty and didn't support reinstatement because "it takes too much money." But if tasked with making the laws, she would institute a death penalty. Further, she noted that the killing of a child is a circumstance that could warrant the death penalty, but when asked whether a defendant convicted of sexual assault and murder of a child should categorically receive the death penalty, she said "some persons may benefit from rehabilitation." Juror No. 6 thought the death penalty was warranted for intentional killing, but he also thought life without parole as punishment for murder is "excellent." Juror No. 7 "[a]gree[d] somewhat" with the statement that a defendant convicted of sexual assault and murder of a child should be sentenced to life without parole regardless of the circumstances, but also "[a]gree[d] somewhat" that such a defendant should be sentenced to death regardless of the circumstances. Juror No. 9 was "neither for nor against" the death penalty but said if he were making the laws, it would be "difficult . . . but [he] probably" would institute a death

penalty law. Juror No. 11 wrote that he "cannot answer this question" when asked in what circumstances the death penalty is warranted, but he later said it may be warranted for all types of killings mentioned on the form. And Juror No. 12 did not believe in "an eye for eye" — "the New Testament fulfills that . . . hate the sin, love the sinner" — but she thought all types of killings could warrant the death penalty.

Today's opinion is correct that the struck jurors made some statements that the seated jurors did not. (Maj. opn., *ante*, at pp. 55–61.) But the court also acknowledges that "both Juror No. 4 and Juror No. 9 expressed reservations about the death penalty that overlapped in certain respects with Shirley R.'s and Adrienne A.'s." (*Id.* at pp. 56–57.) And Alicia R. wrote that in "some cases the death penalty is acceptable" but "[couldn't] say" if there would be a death penalty if she made the laws. Like Juror No. 4, Alicia R. believed in the possibility of redemption. Like Juror No. 12, she believed in the teachings of the New Testament. And like Juror No. 9, she had no strong feelings about the death penalty but felt it was warranted in certain circumstances.

In sum, although the death penalty views of Shirley R., Adrienne A., or Alicia R. differed in some ways from those of the seated jurors, the fine parsing required to tease out those differences hardly suggests they were obvious reasons for the strikes. This hypothesis seems especially speculative in light of the fact that the death penalty views of these black jurors did not prompt the prosecution to challenge them for cause.

## III.

Although every *Batson* issue must be decided on its own facts, it is instructive to take a step back and place today's decision in the broader context of our *Batson* jurisprudence.

As noted, this court has decided the merits of a first-stage *Batson* issue in 42 cases (all capital cases) during the 14 years since *Johnson v. California*. (See appen., *post*, at p. 25.) Not once did we find that the circumstances established a prima facie case of discrimination. What makes this track record even more remarkable is the fact that all 42 cases were tried *before* Johnson v. California *clarified that an inference of discrimination is all that is required at* Batson*'s first step*. In other words, the trial courts in these 42 cases made their first-stage *Batson* rulings at a time when our unduly stringent "strong likelihood" standard was the controlling law. Can it really be that *not a single one* of those rulings was erroneous under the lower standard set forth in *Johnson v. California*? It is not difficult, in my view, to cite several cases where the circumstances plainly gave rise to an inference of discrimination. (See, e.g., *People v. Johnson, supra*, __ Cal.5th at p. __ [p. 1] (dis. opn. of Liu, J.); *id.* at p. __ [p. 2] (dis. opn. of Cuéllar, J.); *People v. Reed* (2018) 4 Cal.5th 989, 1019–1028 (*Reed*) (dis. opn. of Liu, J.); *id.*at p. 1031 (dis. opn. of Kruger, J.); *Harris, supra*, 57 Cal.4th at pp. 870–879 (conc. opn. of Liu, J.); *id.* at pp. 880–882 [discussing *People v. Clark* (2011) 52 Cal.4th 856, 872–873, 904–908 (*Clark*); *People v. Hartsch* (2010) 49 Cal.4th 472, 485–489 (*Hartsch*); *People v. Hoyos* (2007) 41 Cal.4th 872, 900–903].)

A key factor behind this uniformity of results is the court's habit of relying on hypothesized grounds for contested strikes —

a line of reasoning that appears in 30 of the 42 cases. (Appen., *post*, at p. 25.) The most commonly hypothesized reason is a struck juror's death penalty views. (*Ibid.*) As discussed above, this is an area full of complexity and nuance, unlikely to be replete with sharp distinctions among death-qualified jurors. The next most commonly hypothesized reason is a struck juror's (or family member's) negative interaction with, or negative opinion of, the criminal justice system. (*Ibid.*) But "[i]n light of the undeniable evidence that some minority groups . . . have been overpoliced and subjected to harsher sentences than others, it hardly seems race neutral to categorically allow potential jurors to be stricken simply because they have had contact with or hold negative opinions about law enforcement or the judicial system. Reflexively allowing these strikes compounds institutional discrimination . . . ." (*People v. Bryant* (2019) 40 Cal.App.5th 525, 546 (conc. opn. of Humes, J.).)

The court purports to limit hypothesized reasons to " 'obvious' " or " 'readily apparent' " characteristics "that any reasonable prosecutor . . . would logically avoid in a juror." (Maj. opn., *ante*, at pp. 53–54, italics omitted.) I acknowledge there have been instances where the reason for a strike was truly obvious — for example, when the struck juror "was married to a convicted murderer" and "[n]one of the seated or alternate jurors had anything remotely similar in their backgrounds." (*People v. Jones* (2013) 57 Cal.4th 889, 983 (*Jones*) (conc. opn. of Liu, J.).) But, as today's opinion demonstrates, the court is willing to hypothesize reasons well short of something so conspicuous.

Moreover, the limits stated in today's opinion come late in our jurisprudence. Our first-stage *Batson* cases have regularly relied on hypothesized reasons so long as they "reasonably" or

"legitimately" could have caused concern. (E.g., *Clark*, *supra*, 52 Cal.4th at p. 907 ["The prosecutor reasonably could believe that, given J.J.'s profession, she might consciously or unconsciously exert undue influence during the deliberative process, or that fellow jurors would ascribe to her a special legal expertise."]; *Hartsch*, *supra*, 49 Cal.4th at p. 489 ["O.B.'s bias against police officers, G.C.'s failure to complete the questionnaire and his hesitance over evidentiary questions and the confidentiality of deliberations, and K.W.'s initial unwillingness to resolve evidentiary conflicts were all matters that could legitimately give an advocate pause."]; *People v. Taylor* (2010) 48 Cal.4th 574, 644 (*Taylor*) ["Thus, both were engaged in professions the prosecutor reasonably could believe would tend to make them overly sympathetic to the defense."]; *People v. Bonilla* (2007) 41 Cal.4th 313, 347 (*Bonilla*) ["In each of these three cases, the juror's responses would give reason enough for a prosecutor to consider a peremptory, without regard to the juror's sex."]; *People v. Guerra* (2006) 37 Cal.4th 1067, 1102–1103 ["Even though L.B. gave assurances that she could evaluate the evidence objectively, based on these responses, the prosecutor reasonably might have been concerned with L.B.'s negative views of the police and the judicial system based on the incident with her cousin and her self-described strong personality, and challenged her on these bases."].)  A juror characteristic that *a prosecutor reasonably could* find problematic is hardly the same as a characteristic that "*any reasonable prosecutor . . . would* logically avoid." (Maj. opn., *ante*, at p. 54, italics added.)  If today's opinion is intended to turn over a new leaf in our *Batson* doctrine, one would expect to see these prior cases disapproved. But the court repudiates none of them, even though they are plainly at odds with the high court's admonition against "the

imprecision of relying on judicial speculation." (*Johnson v. California, supra*, 545 U.S. at p. 173.)

Similarly, today's opinion acknowledges "the utility" of comparative juror analysis in first-stage *Batson* analysis and notes that our "more recent decisions have considered such comparisons." (Maj. opn., *ante*, at pp. 56–57, fn. 17.) But this also comes late in our jurisprudence. For more than a decade, this court has repeatedly said that comparative juror analysis "is inappropriate" (*People v. Sánchez* (2016) 63 Cal.4th 411, 439) or "has little or no use" (*Bonilla, supra*, 41 Cal.4th at p. 350) in first-stage *Batson* analysis. Today's opinion is grossly inaccurate when it says we have declined to conduct comparative juror analysis "*particularly* when neither the trial court nor this court, in evaluating the prima facie case, has posited possible prosecutorial reasons for the challenged strikes." (Maj. opn., *ante*, at p. 56, fn. 17, italics added.) We have *regularly* declined to conduct comparative juror analysis at *Batson*'s first step in cases where we have relied on hypothesized or even actually stated reasons for contested strikes. (See *Sánchez*, at pp. 439–440; *People v. Streeter* (2012) 54 Cal.4th 205, 225–226, fn. 6; *Clark, supra*, 52 Cal.4th at pp. 907–908 & fn. 13; *Taylor, supra*, 48 Cal.4th at pp. 616–617; *Hawthorne, supra*, 46 Cal.4th at p. 80, fn. 3; *People v. Howard* (2008) 42 Cal.4th 1000, 1019–1020; *Bonilla*, at pp. 343, 347–350.) Again, if today's opinion is intended to turn over a new leaf, one would expect to see these prior cases disapproved. But the court repudiates none of them despite repeated calls to do so. (See *Reed, supra*, 4 Cal.5th at p. 1026 (dis. opn. of Liu, J.); *Sánchez*, at pp. 492–494 (conc. opn. of Liu, J.); *Harris, supra*, 57 Cal.4th at pp. 862–863 (conc. opn. of Kennard, J.); *id.* at pp. 874–876 (conc. opn. of Liu, J.).) The court's refusal to overrule our prior

cases, even though they stand alone against "a mountain of contrary authority" (*Sánchez*, at pp. 492–494 (conc. opn. of Liu, J.) [citing cases]), is quite puzzling and irregular.  (Cf. *People v. Lopez* (Nov. 25, 2019, S238627) __ Cal.5th __, __ [pp. 33–34] [overruling search-and-seizure precedent that had put California in "a minority of one" among all jurisdictions].)

I would like to believe that the limits stated in today's opinion will rein in this court's reliance on hypothesized reasons in first-stage *Batson* analysis.  (Cf. *Harris*, *supra*, 57 Cal.4th at pp. 872–873 (conc. opn. of Liu, J.).)  But in light of our prior case law (which the court does not disapprove) as well as today's decision and another recent decision that relied on "underwhelming" hypothesized reasons to find no inference of discrimination arising from the removal of five out of six black jurors (*Reed*, *supra*, 4 Cal.5th at p. 1025 (dis. opn. of Liu, J.)), I now believe a  different approach is needed.

I see at least two options.  First, the high court could make clear that reliance on hypothesized reasons in first-stage *Batson* analysis is generally impermissible.  Such reliance "effectively short-circuits the three-step framework and defeats the essential inquiry into whether the *possible* reasons for a strike were the prosecutor's *actual* reasons."  (*Harris*, *supra*, 57 Cal.4th at p. 873 (conc. opn. of Liu, J.); see *Johnson v. California*, *supra*, 545 U.S. at p. 172 ["The inherent uncertainty present in inquiries of discriminatory purpose counsels against engaging in needless and imperfect speculation when a direct answer can be obtained by asking a simple question."].)  If there are to be exceptions for "obvious" reasons, it must be emphasized that such exceptions should be rare and truly exceptional — for example, the struck juror "was married to a convicted murderer"

22

(*Jones*, *supra*, 57 Cal.4th at p. 983 (conc. opn. of Liu, J.)) — and not a regular practice of the sort that has appeared in more than two-thirds of our first-stage *Batson* decisions. Further, the practice should be especially disfavored on appellate review in cases where the trial court did not identify any obvious reason for a contested strike.

A second option is for this court, the Judicial Council, or the Legislature to follow the lead of several state high courts that have essentially eliminated *Batson*'s first step. (See *State v. Rayfield* (S.C. 2006) 631 S.E.2d 244, 247; *Melbourne v. State* (Fla. 1996) 679 So.2d 759, 764; *State v. Parker* (Mo. 1992) 836 S.W.2d 930, 939–940; *State v. Holloway* (Conn. 1989) 553 A.2d 166, 171–172; Wn. Gen. Rules, rule 37(d).) Under this approach, whenever a defendant raises a *Batson* challenge to the prosecutor's strike of a prospective juror from a legally cognizable group, "[t]he trial court will then require the state to come forward with reasonably specific and clear race-neutral explanations for the strike." (*State v. Parker*, at p. 939, fn. omitted.)

This approach would serve the important goals of promoting transparency, creating a record for appellate review, and ensuring public confidence in our justice system, while imposing "the comparatively low cost of requiring a party to state its actual reasons for striking a minority prospective juror." (*Harris*, *supra*, 57 Cal.4th at p. 884 (conc. opn. of Liu, J.).) As the Washington Association of Prosecuting Attorneys observed in the development of that state's rule, "[t]he first step of the *Batson* inquiry, a prima facie test, has historically cut off discussion as to meaningful objections to peremptory challenges. That step ultimately served to mask intentional or

23

unconscious bias. Eliminating the prima facie showing will be a highly significant improvement in the process, insofar as it will force litigants to root their challenges in concrete reasons focused directly on a juror's ability to serve." (Wn. Supreme Ct., Proposed New GR 37—Jury Selection Workgroup Final Report (2018) appen. 2, Statement on the Workgroup Final Report Wn. Assn. of Prosecuting Attorneys, p. 1 <www.courts.wa.gov/content/publicUpload/Supreme%20Court%20Orders/OrderNo 25700-A-1221Workgroup.pdf> [as of Nov. 25, 2019].) Our Legislature has passed laws expanding protections against discrimination in jury selection (see, e.g., Code of Civ. Proc., § 231.5), and it can do so again.

One way or another, it is time for a course correction in our *Batson* jurisprudence. The stark uniformity of outcomes in our case law raises a serious concern that our analytical approach has evolved into a one-way ratchet. I would hold that the totality of circumstances in this case gives rise to an inference of discrimination. And because the passage of time makes impractical a remand to explore the prosecution's actual reasons for the contested strikes, I would reverse the penalty judgment. I respectfully dissent.

**LIU, J.**

## APPENDIX

### First-stage *Batson* Decisions by the California Supreme Court Since *Johnson v. California* (2005) 545 U.S. 162

An asterisk (*) denotes that this court hypothesized its own reason or accepted the trial court's hypothesized reason for a contested strike. This does not include cases where the prosecutor stated reasons for the record and this court's analysis considered reasons identical to the prosecutor's stated reasons. (See, e.g., *People v. Sánchez* (2016) 63 Cal.4th 411, 435–437; *People v. Howard* (2008) 42 Cal.4th 1000, 1017–1020.)

A dagger (†) denotes that a prospective juror's death penalty views were hypothesized as a reason for the strike.

A double dagger (‡) denotes that a prospective juror's (or a family member's) negative experience or negative view of law enforcement was hypothesized as a reason for the strike.

1. *People v. Cornwell* (2005) 37 Cal.4th 50*‡

2. *People v. Gray* (2005) 37 Cal.4th 168*‡

3. *People v. Avila* (2006) 38 Cal.4th 491*‡

4. *People v. Williams* (2006) 40 Cal.4th 287*‡

5. *People v. Guerra* (2006) 37 Cal.4th 1067*‡

6. *People v. Bell* (2007) 40 Cal.4th 582

7. *People v. Lancaster* (2007) 41 Cal.4th 50*†‡

8. *People v. Bonilla* (2007) 41 Cal.4th 313*†

9. *People v. Hoyos* (2007) 41 Cal.4th 872*†

10. *People v. Kelly* (2007) 42 Cal.4th 763

11. *People v. Howard* (2008) 42 Cal.4th 1000

12. *People v. Carasi* (2008) 44 Cal.4th 1263

13. *People v. Hamilton* (2009) 45 Cal.4th 863

14. *People v. Hawthorne* (2009) 46 Cal.4th 67

15. *People v. Davis* (2009) 46 Cal.4th 539*†‡

16. *People v. Hartsch* (2010) 49 Cal.4th 472*†‡

17. *People v. Taylor* (2010) 48 Cal.4th 574

18. *People v. Blacksher* (2011) 52 Cal.4th 769*†‡

19. *People v. Garcia* (2011) 52 Cal.4th 706*†‡

20. *People v. Clark* (2011) 52 Cal.4th 856*‡

21. *People v. Dement* (2011) 53 Cal. 4th 1

22. *People v. Thomas* (2012) 53 Cal.4th 771*†‡

23. *People v. Streeter* (2012) 54 Cal.4th 205*†

24. *People v. Elliott* (2012) 53 Cal.4th 535*†

25. *People v. Pearson* (2013) 56 Cal.4th 393*†

26. *People v. Lopez* (2013) 56 Cal.4th 1028*

27. *People v. Edwards* (2013) 57 Cal.4th 658

28. *People v. Harris* (2013) 57 Cal.4th 804*‡

29. *People v. Jones* (2013) 57 Cal.4th 899*‡

30. *People v. Manibusan* (2013) 58 Cal.4th 40*†

31. *People v. Montes* (2014) 58 Cal.4th 809*†

32. *People v. Sattiewhite* (2014) 59 Cal.4th 446

33. *People v. Cunningham* (2015) 61 Cal.4th 609*

34. *People v. Scott* (2015) 61 Cal. 4th 363*‡

35. *People v. Sanchez* (2016) 63 Cal.4th 411

36.    *People v. Clark* (2016) 63 Cal.4th 522

37.    *People v. Zaragoza* (2016) 1 Cal.5th 21*†‡

38.    *People v. Parker* (2017) 2 Cal.5th 1184*†

39.    *People v. Reed* (2018) 4 Cal.5th 989*†‡

40.    *People v. Woodruff* (2018) 5 Cal.5th 697*†‡

41.    *People v. Johnson* (Nov. 25, 2019, S029551) __ Cal.5th __*‡

42.    *People v. Rhoades* (Nov. 25, 2019, S082101) __ Cal.5th __*†‡

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Rhoades

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S082101
**Date Filed:** November 25, 2019

_____

**Court:** Superior
**County:** Sacramento
**Judge**: Loyd H. Mulkey, Jr., Kenneth L. Hake and Maryanne G. Gilliard

_____

**Counsel:**

Richard Jay Moller, under appointment by the Supreme Court, for Defendant and Appellant.

Kamala D. Harris and Xavier Becerra, Attorneys General, Dane R. Gillette and Gerald A. Engler, Chief Assistant Attorneys General, Michael P. Farrell and Ronald S. Matthias, Assistant Attorneys General, Eric Christoffersen, Stephanie A. Mitchell, Sean M. McCoy and Jennifer M. Poe, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Richard Jay Moller
So'Hum Law Center
P.O. Box 1669
Redway, CA 95560-1669
(707) 923-9199

Jennifer M. Poe
Deputy Attorney General
1300 I Street, Suite 125
Sacramento, CA 94244-2550
(916) 324-5474